**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 6, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

GABRIEL TRUJILLO,

    Defendant - Appellee.

No. 19-2212

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:17-CR-03563-MV-1)**
_____

C. Paige Messec, Assistant United States Attorney (John C. Anderson, United States Attorney, with her on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellant.

Ryan J. Villa, The Law Office of Ryan J. Villa, Albuquerque, New Mexico, for Defendant-Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

The government appeals the district-court order granting Defendant Gabriel Trujillo's motion to suppress evidence recovered during an inventory search of his vehicle conducted in connection with the vehicle's impoundment following his arrest for failing to pull over in response to a police command. We hold that the search was

justified as an exercise of law-enforcement community-caretaker functions, as described in *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976), and *Cady v. Dombrowski*, 413 U.S. 433 (1973). Exercising jurisdiction under 18 U.S.C. § 3731, we reverse the district court and remand for further proceedings.

## I. BACKGROUND

Unless otherwise noted, our recitation of events reflects the findings of the district court and facts undisputed by the parties on appeal. In the early hours of December 6, 2017, Bernalillo County Deputy Sheriff Mitchell Skroch was on patrol in the South Valley area of Albuquerque, New Mexico. At 2:41 a.m. he observed a dark-colored Ford Mustang traveling westbound on Central Avenue at about 60 miles per hour in a 35 mph zone. Deputy Skroch initiated pursuit and engaged his emergency lights. When the Mustang failed to stop, Skroch activated his siren. But the Mustang still did not pull over, continuing to drive but slowing to about the speed limit. Skroch followed the Mustang as it turned to go southbound on Unser Boulevard and then to go eastbound on Bridge Boulevard. He saw the Mustang's driver reach his left hand out the driver's side window and appear to sprinkle something onto the road. He also observed the Mustang unlawfully crossing solid white lines on the roadway. Finally, after Skroch had pursued it for about 1.3 miles, the Mustang came to a stop in front of the entrance to a gated community. The gate was set back from Bridge Boulevard, with a raised median separating incoming and outgoing traffic. On the median, which extended several yards back from the gate toward the street (running about halfway down the entryway), was a keypad used by

2

residents to enter the code opening the gate. The car stopped on the right side of the entryway, just before the median. It was set off from the curb by a few feet, with its rear end angled slightly to the left, away from the curb.

Once the car was stopped, Skroch—who had been joined by a deputy responding to Skroch's calls over the radio—ordered Defendant to exit and walk back to the deputies, where he was placed in handcuffs. While looking through the car windows for additional occupants, Skroch spotted in plain view inside the car a holstered Glock handgun tucked between the driver's seat and the center console, a holstered Sig Sauer handgun, and a rifle case on the back seat.

After being read his *Miranda* warnings, Defendant stated that he had not pulled over when Skroch first activated his emergency equipment because he was looking for a safe place to do so. Skroch found this explanation unlikely because Defendant had passed "multiple safe spots to pull over," including well-lit shoulders on the side of the road. Aplt. App., Vol. II at 169–70. Defendant told Skroch that he had purchased the car three days earlier but had not yet changed the registration. He also stated that he was wearing a bullet-proof vest and had the handguns in the car for protection because friends of his ex-girlfriend had made threats against his life.

Disbelieving Defendant's explanation for why he had failed to pull over earlier, Skroch decided to arrest him. Consistent with the policy of the Bernalillo County Sheriff's Office (BCSO), Skroch also determined that the car should be impounded and towed. The policy required that a vehicle be towed when the driver

3

had been arrested and there was no registered owner to take custody.[1]  And Skroch thought it would be dangerous to leave the vehicle where it was, both because its location presented a danger to other drivers and because of the risk that someone would remove the firearms, particularly because there was a high incidence of auto burglaries and thefts in the area.

The BCSO works with several different on-call tow services, all of which transport vehicles to a private tow yard that contracts with the BCSO.  Before towing Defendant's car—and again consistent with department policy—Skroch performed an inventory of its contents.  In addition to the two handguns he had observed from outside the car (both of which were loaded), he found a loaded Sig Sauer assault-style rifle inside the hard rifle case he had seen on the back seat and found a second rifle case underneath the first, this one containing a loaded Wasser AK-47 rifle. Skroch then defeated a small luggage lock securing a camouflage backpack in the back seat and opened it, discovering another handgun with ammunition, a shotgun-shell box containing four bundles of U.S. currency, and four individually wrapped balls of a white crystalline substance that he believed to be methamphetamine. Skroch contacted a deputy attached to the narcotics unit, who prepared a search

---

[1]  According to one of Defendant's pleadings in district court, Skroch knew that Defendant lacked registration papers before he began his inventory of the car. *See* Aplt. App., Vol. I at 14 ("At the time the officer saw the gun, he neither knew who [Defendant] was or where he was coming from.  All the officers collectively knew was that [Defendant] had the title to the Ford Mustang, that [Defendant] had just purchased the vehicle and did not have evidence of registration or insurance, and that he had not refused any of the officer's demands.").

4

warrant that was later signed by a state district judge. Deputies executed the search warrant but did not find anything else of significance.

The white crystalline substance contained in the four balls—which weighed a total of about half a pound—was field-tested as positive for methamphetamine. Also, it was later determined that the car was registered to a person with the initials R.J. in Jarales, New Mexico.

Defendant was indicted in the United States District Court for the District of New Mexico on charges of (1) possession with intent to distribute at least 50 grams of a substance containing methamphetamine, *see* 21 U.S.C. § 841(a)(1) and (b)(1)(B); and (2) possession of a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. § 924(c). In his first motion to suppress he argued, among other things, that the evidence recovered during the inventory search should be suppressed on the ground that his Fourth Amendment rights were violated by the way the inventory search was conducted. After an evidentiary hearing at which Deputy Skroch and others testified, the district court denied Defendant's motion, determining that Skroch's search of the backpack "followed standardized criteria set forth by the [BCSO] and [Skroch] acted in good faith pursuant to those established policies." *United States v. Trujillo*, 341 F. Supp. 3d 1280, 1288 (D.N.M. 2018) (*Trujillo I*). The court noted that there was "no indication that Deputy Skroch's intent [in opening the backpack] was anything other than the purposes indicated in the [BCSO's] policies." *Id*.

5

Defendant then filed a second motion to suppress, which is the subject of this appeal. The motion challenged the validity not of the inventory search, but rather the impoundment itself. Defendant argued both that the BCSO's impoundment policy was itself unreasonable "because it permits impoundment in every case where the driver is arrested," contrary to precedents of the Supreme Court and this circuit, *and* that, "even if the [BCSO's impoundment policy] could be read differently, the warrantless impoundment in this case was unreasonable because there was no community-caretaker basis for impoundment and [the] officer failed to consider alternatives to towing." Aplt. App., Vol. I at 97. The district court held a second evidentiary hearing at which Skroch again testified.

The district court granted Defendant's motion and ordered the evidence suppressed. *See United States v. Trujillo*, 418 F. Supp. 3d 867, 876–79 (D.N.M. 2019) (*Trujillo II*). The court rejected the government's argument that the impoundment was justified under the community-caretaking rationale described by the Supreme Court in *Opperman*, holding that "the government ha[d] not carried its burden of showing that Deputy Skroch's decision to impound [Defendant's] car was justified by the need to protect public safety or to facilitate the flow of traffic." *Trujillo II*, 418 F. Supp. 3d at 876; *see id.* ("The instant case did not involve a vehicle stopped dangerously on the shoulder of a highway; disabled by an accident; left unattended, as in *Opperman* itself; or impeding traffic on a busy road."). Also, it determined that the presence of the firearms was "not a relevant consideration" in its

6

analysis of the community-caretaking justification, citing testimony by Skroch that he made the decision to impound before seeing the firearms. *Id.*

The district court proceeded to consider the reasonableness of the impoundment under *United States v. Sanders*, 796 F.3d 1241 (10th Cir. 2015), in which we identified several factors to assist in determining whether an impoundment, though not authorized under *Opperman*, can nevertheless be justified on the basis of some other "reasonable, non-pretextual community-caretaking rationale." *Id.* at 1248. The court concluded that although Skroch made the decision to impound based upon a "standardized policy," the Government had "failed to carry its burden . . . to demonstrate a reasonable, non-pretextual community-caretaking rationale justifying the decision to impound." *Trujillo II*, 418 F. Supp. 3d at 877. The two strongest factors weighing against reasonableness, according to the district court, were Skroch's failure to seek Defendant's consent to tow the car and his failure to consider "any alternatives to towing, such as allowing [Defendant] to arrange for someone else to pick up the vehicle, allowing him to contact a private tow company, or allowing him to park the vehicle along the curb or somewhere nearby." *Id.* at 878. Finally, although it did not actually rule on this issue, the district court noted its concern over the BCSO's impoundment policy, warning that "[i]f the same policy continues to remain in effect and continues to subject motorists in Bernalillo County to automatic impoundments and warrantless inventory searches in almost every case of arrest, an analysis of the policy's facial validity may be in order." *Id.* at 877 n.4.

## II.    DISCUSSION

We review the district court's findings of fact for clear error, viewing "the evidence . . . in the light most favorable to the district court findings." *United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992). "[T]he ultimate determination of the reasonableness of" the impoundment, however, "is a question of law to be reviewed by this court de novo." *Id.* The government bears the burden of demonstrating the reasonableness of the impoundment. *See United States v. Taylor*, 592 F.3d 1104, 1107 (10th Cir. 2010).

### A.    Applicable Law

The search of Defendant's vehicle was justified on two separate community-caretaking grounds. First, impoundment of the vehicle was proper (and Defendant does not dispute that if the impoundment was proper, the inventory search was lawful). When an unoccupied vehicle would impede traffic and the registered owner cannot readily arrange for someone to drive it away, law-enforcement officers may impound the vehicle. Second, officers may take reasonable steps to protect the public by removing firearms (and searching for additional firearms) from unattended vehicles under their control in areas accessible to the public.

The leading case on the first ground is the Supreme Court opinion in *Opperman*. The Court reviewed an impoundment and inventory search carried out by police in Vermillion, South Dakota. *See Opperman*, 428 U.S. at 365. The car of defendant Donald Opperman had been parked in a part of downtown Vermillion where parking was prohibited between the hours of 2:00 a.m. and 6:00 a.m. *See id.*

8

At about 3:00 a.m. a Vermillion police officer "issued an overtime parking ticket and placed it on the car's windshield." *Id.* Seven hours later, at 10:00 a.m., another officer, observing that the car was still parked in the same spot, issued a second overtime ticket. *See id.* at 365–66. As was routine, these circumstances were reported to headquarters and, after first being inspected, the car was towed to the city impound lot. *See id.* at 366. During the later inventory search, police discovered a bag of marijuana inside the unlocked glove compartment, and Opperman was charged with possession of marijuana. *See id.*

The Supreme Court held that both the impoundment and the search were reasonable under the Fourth Amendment. *See id.* at 376. The Court identified "three distinct needs" supporting the reasonableness of routine post-impoundment inventory searches: "the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369 (citations omitted). Addressing the impoundment, the Court recognized law enforcement's authority to remove vehicles "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions,'" noting that more than 100,000 cars were towed from New York City streets in 1969 alone. *Id.* at 368–69, 369 n.3 (quoting *Dombrowski*, 413 U.S. at 441). The Court described the contours of that authority as follows:

> To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in

9

caretaking and traffic-control activities. *Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.*

*Id.* at 368–69 (emphasis added) (footnote omitted). The Court determined that the impoundment of Opperman's vehicle was justified under this standard. *See id.* at 375–76.

It is important to recognize the breadth of what is encompassed by "efficient movement of vehicular traffic," "impeding traffic," and "public safety and convenience." *Id.* at 369. The impounded automobile in *Opperman* was in a lawful parking spot. Perhaps between 2:00 a.m. and 6:00 a.m. it was blocking street-maintenance work, but when it was impounded the sin was parking overtime. A more recently arrived vehicle could have lawfully parked there. It was not blocking the flow of traffic. As far as one can discern from the Supreme Court opinion, the only way in which the vehicle was impeding traffic was by reducing the number of available parking spots, perhaps requiring drivers of other vehicles to waste time and slow traffic while searching for other places to park.

The Court again addressed the constitutionality of impoundments and inventory searches in *Colorado v. Bertine*, 479 U.S. 367 (1987). Boulder, Colorado police arrested defendant Steven Bertine for driving while under the influence of alcohol. *See id.* at 368. After deciding to impound Bertine's van, officers performed an inventory of its contents, discovering "controlled substances, cocaine

10

paraphernalia, and a large amount of cash" inside a closed backpack. *Id.* at 369. The Court upheld the inventory search, stating that in the absence of any "showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation," the governmental interests in securing the property and "avert[ing] any danger" it may have posed to police or others outweighed Bertine's Fourth Amendment interests. *Id.* at 372–73. The Court rejected the argument that the impoundment and inventory were improper because the property could have been secured through alternative, less intrusive means, stating: "[W]hile giving Bertine an opportunity to make alternative arrangements would undoubtedly have been possible, . . . '[t]he real question is not what "could have been achieved," but whether the Fourth Amendment *requires* such steps.'" *Id.* at 373–74 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983)). The Court also rejected Bertine's argument that the impoundment was unconstitutional because "departmental regulations gave the police officers discretion to choose between impounding his van and parking and locking it in a public parking space." *Bertine*, 479 U.S. at 375. Nothing precluded the exercise of officer discretion in impoundment decisions, the Court reasoned, "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* Although "departmental regulations gave [Boulder] police officers discretion to choose between impounding [a vehicle] and parking and locking it in a public parking space," the Court determined that such discretion *was* exercised according to sufficiently standardized criteria—namely, "several conditions that must be met

11

before an officer may pursue the park-and-lock alternative," including a prohibition on pursuing that alternative "where there is reasonable risk of damage or vandalism to the vehicle or where the approval of the arrestee cannot be obtained." *Id*. at 375–76, 376 n.7.

*Bertine* tells us that law-enforcement officers are not required to accommodate every request to avoid impoundment of a vehicle that is impeding traffic. This was implicit in *Opperman*, where there was no suggestion that the officer needed to go out of his way to contact Mr. Opperman or otherwise delay performance of his other duties before having the vehicle towed. On the other hand, we are confident that if Mr. Opperman had arrived at his vehicle while the officer was noting that it had been parked there too long, the Supreme Court would have thought it unreasonable for the officer to have the vehicle towed when Mr. Opperman could have moved the vehicle himself (assuming, of course, Mr. Opperman could establish his ownership and carried a driver's license).

This circuit's case law conforms to those principles. In the years since *Opperman* we have approved impoundments in a variety of community-caretaker contexts and, almost without exception, have upheld impoundment of vehicles pulled over on roadways. For instance, in *United States v. Horn*, 970 F.2d 728 (10th Cir. 1992), the defendant was stopped on Interstate Highway 80. *See id.* at 729. Because the "[d]efendant was traveling alone and was placed under arrest under a warrant for parole violation," we said that "his car, *of necessity*, had to be impounded." *Id.* at 732 (emphasis added). In many of these cases, impoundment was also supported by

12

uncertainty regarding the ownership or registration of the vehicle or the absence of a licensed driver to take custody of the vehicle following the arrest of the original driver. *See United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997) (following arrest of driver and a passenger, vehicle was impounded "for two reasons: to hold pending identification of the owner and . . . for further investigation by the [drug-enforcement agency]"; despite partial investigative motive, impoundment was upheld as reasonable because departmental policy required impoundment in all instances of driver arrest and because neither driver nor passenger "could prove ownership of the vehicle [or] provide proof of registration"; apparently because of the absence of this necessary documentation, a non-arrested passenger "could not have taken immediate custody of the car"); *United States v. Hunnicutt*, 135 F.3d 1345, 1351 (10th Cir. 1998) (driver was pulled over on the shoulder of a highway and arrested for driving with a suspended license; although one of the two passengers had a valid driver's license, the driver was not the registered owner and "had no evidence of authority to permit another to drive the vehicle, and no one produced any verification of insurance[, so] the officers properly impounded the vehicle in their community-caretaking function"); *Taylor*, 592 F.3d at 1106–08 (impoundment was appropriate following arrest of driver who claimed that the car had been rented by his girlfriend's mother who was "reportedly hundreds of miles away" in El Paso; department policy allowed only the *vehicle owner* to make alternative arrangements for the vehicle in event of arrest); *United States v. Long*, 705 F.2d 1259, 1262 (10th Cir. 1983) ("Because none of the [car's] four [occupants] could establish ownership

13

of the Thunderbird, the police could properly impound the car until ownership could be ascertained."); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) ("We have held that law enforcement officers may impound an automobile until the ownership of the vehicle can be ascertained. Similarly, the police are not required to release a vehicle when there is no licensed driver to attend to it." (citation omitted)).

The sole exception to our general approval of impoundment of vehicles stopped on a roadway is *United States v. Ibarra*, 955 F.2d 1405 (10th Cir. 1992), where we upheld the district court's decision to suppress the evidence in light of a confluence of special circumstances. As we summarized that decision in *Sanders*, "the officer's decision to impound the vehicle did not meet any of the criteria for impoundment under Wyoming state law"; the driver (whose license had expired) was not arrested and was not permitted an adequate opportunity to make arrangements for custody of the vehicle; and, perhaps critical to the conclusion, the officer's testimony regarding the public-safety reasons for the impoundment was not credible, suggesting (along with substantial other evidence) that the reasons given were pretextual. 796 F.3d at 1246.

We also note that in multiple opinions we have upheld impoundment of vehicles parked in private lots and other locations where unoccupied vehicles may still constitute nuisances, although their impact on traffic is questionable. For example, in *United States v. Kornegay*, 885 F.2d 713 (10th Cir. 1989), the defendant, Roger Kornegay, was arrested at an auction company while attempting to collect proceeds from the sale of two stolen tractors. *See id.* at 715. Officers impounded

14

Kornegay's car, which he had left parked in the company's parking lot, and inventoried the contents, discovering inculpatory evidence. *See id.* Kornegay argued that the vehicle was not blocking traffic and its removal had not been requested, so there was no need to move it. *See id.* We held that impoundment was appropriate because Kornegay's true identity and place of residence were not known, Kornegay "was alone, and there was no friend, relative or companion who could be asked to care for the car," "the vehicle was not parked on [Kornegay's] property," he was unlikely to return soon to take care of the car, and leaving the vehicle in the auction company's lot "could have subjected it to vandalism or theft." *Id.* at 716; *see also United States v. Johnson*, 734 F.2d 503, 505 (10th Cir. 1984) (per curiam) (impoundment of vehicle parked in the Brandy's Club Lounge parking lot was appropriate given intoxicated defendant's inability to drive and concerns regarding vandalism); *United States v. Martin*, 566 F.2d 1143, 1144–45 (10th Cir. 1977) (upholding impoundment of vehicle legally parked on a residential street at 2:30 a.m. when defendant, who had just been placed under arrest for public intoxication, "was in no condition to drive his vehicle" and the other vehicle occupant had been arrested for carrying a concealed weapon). But we have recognized that impoundment of such vehicles is not reasonable when there are clear and promptly available alternatives or the vehicle poses no risk, as when it is parked at the owner's home. *See United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir. 1984) ("there was no need for the impound and inventory search" of car parked at private club after driver was arrested, when district court found that arrestee "had a young lady friend with

15

him . . . who, if asked, might well have been able to take the car and [drive] it to the police station or something of that kind. He had other friends who were there who, if inquired of, might have taken it into custody. There was the owner of the bar who could have been inquired of if it could have been left there until he returned. He is a well known person in the community. His family lives close." (internal quotation marks omitted)); *cf. United States v. Chavez*, 985 F.3d 1234, 1244–45 (10th Cir. 2021) (community-caretaking doctrine inapplicable where car containing gun was "lawfully parked at the end of a long, private, dirt road outside an isolated trailer," as opposed to "a public spot readily accessible to children, vandals, or thieves," and the trailer's inhabitant (also the car's owner) "might well have taken the firearm into the trailer" for safekeeping).

The presence of firearms in an unoccupied vehicle under police control provides an additional ground for searching the vehicle, even when the vehicle itself is not a cause for concern at the time of the search. In *Dombrowski*, Chester Dombrowski, a Chicago police officer, crashed his car while drunk. *See* 413 U.S. at 435–36. After arresting Dombrowski, who, "being intoxicated (and later comatose), could not make arrangements to have the vehicle towed and stored," local police officers had the vehicle towed to a privately owned tow yard. *Id.* at 436, 443. [2] Believing that Chicago police officers were required to have their service weapons

---

[2] The Court said that the "police had exercised a form of custody or control over" the vehicle by having it towed from the scene of the accident. *Dombrowski*, 413 U.S. at 442–43; *see id.* at 447 (officers "exercise[d] control over [the vehicle] by having it towed away").

16

with them at all times and not having found a gun on Dombrowski's person when he was arrested, an officer went to the tow yard and, following standard procedures, searched the car for the gun, discovering instead bloody clothing and other evidence of a murder. *See id.* at 437.

Recognizing the legitimacy of police "community caretaking functions," *id.* at 441, the Court held that the decision to search the car was reasonable because of the need to "protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands," *id*. at 443. The Court rejected the argument that law enforcement's actions were unreasonable because the gun could have conceivably been secured by other means. *See id.* at 447 ("The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable."). The court noted that the vehicle "was not parked adjacent to the dwelling place of the owner . . . nor simply momentarily unoccupied on the street." *Id.* at 446–47; *see Chavez*, 985 F.3d at 1244–45 (car with firearm was parked by residence of car's owner at end of private dirt road).

In *Johnson* we applied *Dombrowski* to uphold a search under similar circumstances. The defendant was arrested after having been found "sitting in his car, highly intoxicated, with a .357 caliber magnum revolver in plain view on the passenger seat." 734 F.2d at 504. We held that officers were entitled to search the car, not only on the basis of the impoundment and accompanying inventory, but also on the ground that the officers needed to secure any additional firearms. *See id.* at

17

505 ("[Defendant]'s revolver in plain view clearly justified a search of the rest of the automobile for other weapons.").

### B. Application

The above precedent compels reversal of the district court's suppression order. The hazard posed by Defendant's Mustang easily satisfies *Opperman*. Deputy Skroch testified that the position of the Mustang, as it was left by Defendant, prevented other cars from passing by to enter the gated community. This is consistent with the district court's findings in rejecting Defendant's first motion to suppress. *See Trujillo I*, 341 F. Supp. 3d at 1282 ("The car was blocking the gate."). So positioned, the Mustang threatened both the "safety and convenience," *Opperman*, 428 U.S. at 369, of any returning complex residents, who, at the very least, would be inconvenienced by having to wait for the car to be removed and, at worst (perhaps distracted by preparation for opening the gate), might collide with the unexpected unlit vehicle.

And even if we assume, as the district court appeared to, *see Trujillo II*, 418 F. Supp. 3d at 876, that one of the deputies (or, more implausibly, Defendant) could have simply moved the car all the way over to the right-hand curb, *Opperman* would still be satisfied. To be sure, the district court found that a photograph submitted by defense counsel "clearly shows that the entranceway is wide enough to allow a vehicle to proceed into the community past another that was parked along the right-hand curb." *Id.* at 870. But the photograph is far from definitive on the matter. It shows two cars (neither an SUV) parked on the entrance driveway. The photograph,

18

however, was taken from an angle, rather than head-on, and shows the nearer car at least a car length ahead of the other; so the gap visible between the cars was virtually inevitable. (Indeed, one wonders why there was no head-on photograph of the cars side-by-side if the roadway was wide enough to accommodate both.) In any event, even if some cars could have passed by the Mustang, that does not mean that the Mustang was not "impeding traffic or threatening public safety and convenience." *Opperman*, 428 U.S. at 368–69. If passing by the Mustang would have been a tight squeeze, the necessary maneuver would slow progress and might lead to minor damage. And since incoming drivers would not be expecting a vehicle in the driveway, there was opportunity for a more serious collision with the dark Mustang parked to the side even if there was ample room for the other vehicle to pass it. The Mustang also would have made it difficult, if not impossible, for wider-bodied emergency vehicles such as ambulances or firetrucks to pass if needed within the complex.

Given the hazard presented by the Mustang, the officers' decision to impound the vehicle was reasonable. There was no licensed passenger. Defendant lacked registration documents. And 2:30 a.m. was not a good time of day to look for help from friends. The deputies were not required to allow Defendant to call someone to come pick up the Mustang and then, assuming he was successful, wait around for the new driver to arrive. We are aware of no precedent that would question the reasonableness of impounding in these circumstances. *See Bertine*, 479 U.S. at 374 ("The real question is not what could have been achieved, but whether the Fourth

19

Amendment *requires* such steps . . . [.]  The reasonableness of any particular

governmental activity does not necessarily or invariably turn on the existence of

alternative less intrusive means." (original brackets and internal quotation marks

omitted)); 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth

Amendment*, § 7.3(c), at 822 (5th ed. 2012) (After *Bertine*, "[i]t . . . seem[s]

reasonably clear that the failure to give a person an opportunity to make reasonable

alternative arrangements for the vehicle would not invalidate an inventory search

under Fourth Amendment principles." (internal quotation marks omitted)).  This

proposition from *Bertine* has been regularly followed in this court's unpublished

opinions.  *See United States v. Baskin*, 120 F. App'x 223, 224 (10th Cir. 2004)

(affirming denial of suppression motion, in part because it would have been

"unreasonable at that hour (about 3:00 a.m.) to attempt to contact someone who could

pick up the car" in order to avoid impoundment); *United States v. Walker*, 81 F.

App'x 294, 297 (10th Cir. 2003) ("Nothing in the Fourth Amendment requires a

police department to allow an arrested person to arrange for another person to pick up

his car to avoid impoundment and inventory." (internal quotation marks omitted));

*United States v. Moraga*, 76 F. App'x 223, 227–28 (10th Cir. 2003) (impoundment

was reasonable even though arrestee's mother could "come and pick up the car" in

"an hour"); *cf. United States v. Jackson*, 682 F.3d 448, 454–55 (6th Cir. 2012)

(holding that officers acted reasonably in impounding vehicle stopped in a private

driveway and rejecting argument that they should have first contacted the property

owner or the vehicle's owner (the driver's fiancée)); *United States v. Cherry*, 436

20

F.3d 769, 775 (7th Cir. 2006) ("[T]he Fourth Amendment [does not] demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search.").

Defendant argues in his appellate brief that regardless of whether the impoundment and inventory search would otherwise have been lawful, they are tainted by the pretextual reasons provided by Deputy Skroch. The argument has some legal purchase, *see Ibarra*, 955 F.2d at 1409–10, but it lacks a factual foundation. The district court made no finding of pretext. On the contrary, in denying Defendant's first motion to suppress, the district court explicitly found that Skroch "acted in good faith pursuant to [BCSO's] established [inventory] policies." *Trujillo I*, 341 F. Supp. 3d at 1288; *see id.* ("[T]here is no indication that Deputy Skroch's intent was anything other than the purposes indicated in the [BCSO's] policies."). Although the impoundment itself was not specifically at issue in Defendant's first motion to suppress, it is hard to envision a scenario in which Skroch could have pursued impoundment, but not the inventory search, in furtherance of an investigatory motive. To be sure, the district court questioned the "credibility" of two specific pieces of Skroch's testimony—namely, his assessment that "there would not have been enough room for another vehicle to enter the community even if [the Mustang] was moved to the curb," *Trujillo II*, 418 F. Supp. 3d at 870, and his statement that "commuter traffic [was] picking up around the time of the stop," *id.* at 876. But the court did not extrapolate from what it found to be two errors in the officer's account and express a view that Skroch was lying about his motivations.

21

Besides, even if the district court had found that Skroch was motivated in part by an investigatory motive (it did not), that would still be insufficient ground to require suppression. *See Bertine*, 479 U.S. at 372 (upholding inventory search where "there was no showing that the police, who were following standardized procedures, acted in bad faith or *for the sole purpose* of investigation" (emphasis added)); *Haro-Salcedo*, 107 F.3d at 771–72 (upholding impoundment in "multiple-motivation scenario," where district court found that one reason for officers' impoundment of vehicle was to hold it "for further investigation by the DEA"); *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018) (unpublished) ("[A] dual motive does not invalidate an otherwise lawful impound and inventory.").

Finally, we reject Defendant's contention that our decision in *Sanders* requires a different outcome. In that case, the defendant, Beverly Sanders, was arrested on an outstanding warrant as she and a companion exited an Aurora, Colorado Goodwill store and walked toward her car, which was parked in the store's lot. *See Sanders*, 796 F.3d at 1243. Despite Sanders's offer to have a third party come pick up the vehicle and the fact that it was lawfully parked in the private lot, Aurora police officers "decided to impound [the car] out of fear that its contents, attractive exterior, and after-market accessories would lead to a break-in, particularly because it was located in a high-crime area after dark." *Id.* On appeal we affirmed the district court decision ordering the suppression of the illicit drugs discovered during the inventory search performed by the Aurora police. *See id.*

22

Importantly, *Sanders* was not considering an impoundment authorized by *Opperman*. *Sanders* put the circumstances before the court in the following context:

> *Opperman* and *Bertine* establish two different, but not inconsistent, rules regarding when impoundments are constitutional. The *Opperman* decision establishes that some warrantless impoundments are constitutional: namely, those required by the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic. Meanwhile, the *Bertine* decision establishes that other warrantless impoundments are unconstitutional: namely, those justified by police discretion that is either exercised as a pretext for criminal investigation or not exercised according to standardized criteria. However, *Bertine* and *Opperman* leave a large number of impoundments open to case-based reasonableness judgments: namely, those carried out pursuant to standardized criteria but not justified by the public safety and traffic control goals of *Opperman*.

*Id.* at 1245. The court then proceeded to provide guidance with respect to this third category of case, as necessary to decide the situation before it.

As discussed at length above, the impoundment and search in this case clearly come within the authority of *Opperman*. Defendant cites to language in *Sanders* stating that *Opperman* justifies an impoundment only if impoundment is "immediately necessary" to protect against an "imminent threat." Aplee. Br. at 13, 19. But those words were dicta, since in *Sanders* itself nothing indicated any sort of threat to public safety or traffic. The vehicle had been parked in a private lot and the government did not argue it posed even an inconvenience, much less a hazard, to anyone. Instead, the government focused exclusively on the risk that Sanders's car might be subject to theft or vandalism if left unattended. There was no need in that case to expound on the temporal limits of *Opperman*. Moreover, there is no such strict temporal constraint in the opening paragraph of *Sanders*, which includes the

23

statement: "[W]e hold that when a vehicle is not impeding traffic or impairing public safety, impoundments are constitutional only if guided by both standardized criteria and a legitimate community-caretaking rationale." 796 F.3d at 1243; *see Opperman*, 428 U.S. at 369 ("[T]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."). And it would be hard to say that *Opperman* required such immediacy or imminence when it upheld the impoundment of a vehicle that had been unlawfully parked for at least seven hours. Nor has that requirement appeared in any of our precedents; *Sanders* cites no authority for an immediately-necessary or imminent-threat requirement, and several previously cited circuit precedents, *see Taylor*, 592 F.3d at 1106–08; *Hunnicutt*, 135 F.3d at 1351; *Haro-Salcedo*, 107 F.3d at 771; *Horn*, 970 F.2d at 732; *Long*, 705 F.2d at 1262, are inconsistent with such a requirement. *Sanders* paraphrases the *Opperman* standard eight times;[3] given the variety of means

---

[3] "[W]e hold that when a vehicle is not *impeding traffic or impairing public safety*, impoundments are constitutional only if guided by both standardized criteria and a legitimate community-caretaking rationale." *Sanders*, 796 F.3d at 1243 (emphasis added).

"The *Opperman* decision establishes that some warrantless impoundments are constitutional: namely, those required by the community-caretaking functions of *protecting public safety and promoting the efficient movement of traffic*." *Id*. at 1245 (emphasis added).

"However, *Bertine* and *Opperman* leave a large number of impoundments open to case-based reasonableness judgments: namely, those carried out pursuant to standardized criteria but not justified by *the public safety and traffic control goals of Opperman*." *Id*. at 1245 (emphasis added).

"Meanwhile, in *Ibarra*, we recognized that the *'reasons of public safety'* identified in *Opperman* can, if credibly present, provide a constitutionally sufficient basis for

24

by which it is expressed, it is unsurprising that some of those expressions may be problematic if applied in a different context.  We do no violence to our decision in *Sanders* by upholding the impoundment in this case, a result fully consistent with Supreme Court and Tenth Circuit precedent.

In addition, the search of the Mustang was permissible for a proper reason other than the *Opperman* rationale.  Even if the Mustang could have safely been left parked in or around the entryway, under *Dombrowski* and *Johnson* the deputies would have still been entitled to remove the firearms visible from outside the car and to search for others, lest they "fall into untrained or perhaps malicious hands." *Dombrowski*, 413 U.S. at 443; *see Johnson*, 734 F.2d at 505.  The district court rejected this rationale on the ground that Deputy Skroch had decided to impound

---

impoundment even absent guidance from standardized criteria."  *Id.* at 1247 (emphasis added).

"We hold that impoundment of a vehicle located on private property that is neither *obstructing traffic nor creating an imminent threat to public safety* is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale."  *Id*. at 1248 (emphasis added).

"*Opperman* envisioned a situation in which an impoundment is *immediately necessary*, regardless of any other circumstances, in order *to facilitate the flow of traffic or protect the public from an immediate harm*."  *Id.* at 1249 (emphasis added).

"Yet *Opperman* establishes that if a vehicle is *obstructing or impeding traffic on public property*, it can be impounded regardless of whether the impoundment is guided by standardized procedures."  *Id*. at 1249 (emphasis added).

"Applying the rule elucidated above to the facts of this case, we conclude that the impoundment was impermissible because the officers were not guided by standardized criteria.  The vehicle was legally parked in a private lot, and there is no evidence that it was *either impeding traffic or posing a risk to public safety*."  *Id*. at 1250 (emphasis added).

Defendant's vehicle before noticing the firearms within it. *See Trujillo II*, 418 F. Supp. 3d at 876. But the Fourth Amendment does not govern unrealized *intentions* to search or seize, and Skroch certainly was concerned about the firearms by the time he commenced the impoundment.

## III.    CONCLUSION

We **REVERSE** the order granting the motion to suppress and **REMAND** to the district court for further proceedings consistent with this opinion.