**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 15, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MANUEL JONATHAN ULIBARRI,

    Defendant - Appellant.

No. 24-2080

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CR-01826-JB-1)**

_____

Ryan Thomas Truskoski, Ryan Thomas Truskoski, P.A., Las Cruces, New Mexico, for Defendant-Appellant.

Tiffany L. Walters, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

_____

Before **McHUGH**, **MURPHY**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Two Albuquerque police officers pulled over Manuel Ulibarri after hearing excessive noise coming from his car. When they ran Ulibarri's information, they found two outstanding bench warrants and arrested him. The officers then impounded Ulibarri's car, and a subsequent inventory search of the car turned up fentanyl and a

gun. Facing federal drug and gun charges, Ulibarri moved to suppress the evidence from his car, challenging the stop, the impoundment, and the inventory search as pretextual and therefore unconstitutional. The district court denied the motion to suppress, and Ulibarri appeals.

We affirm. The officers had the requisite reasonable suspicion to pull Ulibarri over for violating laws and ordinances prohibiting excessive vehicle noise. And although the officers decided to arrest Ulibarri for two reasons—properly for the bench warrants and improperly to search his car for evidence of a crime—the Fourth Amendment doesn't prohibit these kinds of mixed motives. With Ulibarri arrested and unable to drive the car away, the officers had authority to impound Ulibarri's car because it was parked on the street in a manner that violated parking laws; nothing required the officers to permit Ulibarri to make alternative arrangements. And the subsequent inventory search, though poorly documented, was reasonable.

## Background

In May 2021, Albuquerque police officers Lucas Perez and Neill Elsman heard the sound of a loud car exhaust a few blocks away and went to find the car, which sounded like it violated Albuquerque's city ordinance prohibiting excessive vehicular noise. The officers identified the car as Ulibarri's and pulled him over.

2

Ulibarri pulled over to the side of the road, next to the sidewalk, and parked between two parking spots:



Supp. R. vol. 2, Ex. 11, at 00:42. The car might have been subject to parking citations for occupying two metered parking spots, but it would not have been towed immediately. At the time of the stop, there was little to no traffic, and the car did not obstruct the flow of traffic.

Perez and Elsman approached Ulibarri's car and explained that they'd stopped him because of his loud exhaust. Elsman saw ammunition in Ulibarri's backseat, and asked Ulibarri if he had any weapons. Ulibarri said he didn't have a gun in the car, but he acknowledged the bullets in the back and explained that his son had been playing with them. The officers ran Ulibarri's information through their database and discovered two outstanding bench warrants. Both were for misdemeanors and allowed Ulibarri to post bond and be released without an arrest.

Speaking out of Ulibarri's earshot near the police cruisers, Perez told Elsman that he planned to arrest Ulibarri on the warrants. Perez said, "I'm gonna take [Ulibarri] out. . . . There were bullets in the car, so he might have something." *Id.* at Ex. 11, at 6:30–6:45. The district court interpreted this comment to mean that Perez believed Ulibarri potentially possessed something illegal and thus Perez had an improper investigatory motive.[1] Perez and Elsman returned to Ulibarri's vehicle and arrested him. Ulibarri told them he knew about the warrants and asked to pay the bond at the bond window. Perez said it might be an option; the bond window was not far from the location of the stop. But Perez later testified that he chose not to take Ulibarri to the bond window because he was concerned that Ulibarri didn't care about the warrants and because Ulibarri's vehicle was "deafening" and shouldn't be on the streets. R. vol. 2, 42.

Immediately following Ulibarri's arrest, Elsman called for a tow truck. As Perez led Ulibarri away from the vehicle, Ulibarri told officers there was a gun in the car, and he asked to have his mother come pick up the car. The officers didn't respond to this question at first. Then, when Ulibarri repeated his request, they told him the situation was developing. At the suppression hearing, Perez testified "it was

---

[1] The government suggests—fairly persuasively—that this factual finding is clearly erroneous. In the body-camera audio, Perez says in full, "I'm gonna take him out. Just use 48, because there were some bullets in the car, so he might have something." Supp. R. vol. 2, Ex. 11, at 6:32–6:37. Because the code "48" means "use caution," the government argues that Perez's statement suggests a concern for officer safety, whether instead of or in addition to an investigatory motive. But because the government doesn't develop or rely on that argument, we will accept the district court's factual finding for purposes of this appeal.

never really an option to have somebody else . . . take a vehicle" because Perez didn't know who was coming, how far away the other person was, or whether they could legally drive. *Id.* at 47–48. Perez also testified that it would have been "very dangerous" to leave Ulibarri's car unattended in a high-crime area of Albuquerque. *Id.* at 44. Likewise, Elsman testified that he would not have felt comfortable allowing Ulibarri to pay the bond and leave his car there because "the vehicle could be broken into[,] and the firearm could be stolen." *Id.* at 105.

Ulibarri's mother arrived, though Ulibarri did not summon her, and asked to take the car. But the tow truck was already arriving, and the officers refused her request. Before the vehicle was towed, officers searched it, discovering a pistol, a rifle, a magazine, $10,000 in cash, and drugs. Officers didn't itemize the car's contents during the search. But they later prepared a tow-in report identifying Ulibarri's arrest as the reason for the tow and listing the following items found during the search: "[one] loaded handgun located under the driver seat, [one] loaded rifle located on the rear passenger seat, [and] paraphernalia collected by officer on scene." Supp. R. vol. 1, 5 (cleaned up).

The government indicted Ulibarri on two counts: possession with intent to distribute fentanyl and possession of a firearm in furtherance of a drug-trafficking crime. Ulibarri moved to suppress the evidence from his car, arguing the stop and the subsequent impoundment and inventory search violated the Fourth Amendment. After conducting an evidentiary hearing, the district court denied the motion. Ulibarri pleaded guilty, reserving his right to appeal the denial of his motion to suppress. The

5

district court sentenced him to 72 months in prison. He appeals the denial of his motion to suppress.

## Analysis

"When reviewing the denial of a motion to suppress, 'we consider the totality of the circumstances and view the evidence in a light most favorable to the government.'" *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011) (quoting *United States v. Higgins*, 282 F.3d 1261, 1269 (10th Cir. 2002)). We review any factual findings by the district court for clear error. *Id.* But the ultimate question "of reasonableness under the Fourth Amendment is a question of law reviewable de novo." *Id.* (quoting *Higgins*, 282 F.3d at 1269).

Ulibarri challenges the above series of events as a pretextual investigatory interaction that violates the Fourth Amendment under three primary theories. Ulibarri first argues that Perez and Elsman lacked reasonable suspicion to stop him for an excessive-vehicular-noise violation. Second, Ulibarri challenges the impoundment, highlighting the district court's finding that Perez had an improper investigatory motive and arguing that the car did not present a public-safety risk and that alternatives to impoundment existed. Last, Ulibarri argues that the officers' failure to note important items from the inventory search on the tow-in report demonstrates that the inventory search was pretextual. We consider each challenge in turn.

## I. Traffic Stop

Ulibarri first argues that officers lacked reasonable suspicion for the traffic stop. The Fourth Amendment guarantees "[t]he right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is "a seizure of persons within the meaning of" the Fourth Amendment, so a stop is constitutional only if it is reasonable. *Whren v. United States*, 517 U.S. 806, 809–10 (1996) (cleaned up). That is why a traffic stop "must be justified by reasonable articulable suspicion" that a traffic violation has occurred. *United States v. Ledesma*, 447 F.3d 1307, 1312 (10th Cir. 2006). "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (quoting *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004)). Reasonable suspicion is a low bar; "[e]vidence falling 'considerably short' of a preponderance satisfies this standard." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

Here, officers claimed to have reasonable suspicion that Ulibarri's noisy muffler violated the law. Albuquerque's city code requires vehicles to have a "muffler in good working order of construction sufficient to prevent excessive or unusual noise." Albuquerque, N.M., Code § 8-6-13(A). And the city code bans modification of mufflers "in a manner such that the noise emitted by the motor vehicle is increased above that emitted by the motor vehicle as originally manufactured." *Id.* § 8-6-13(B). Similarly, New Mexico law requires vehicles to have a muffler sufficient "to prevent excessive or unusual noise." N.M. Stat. Ann. § 66-3-844(A).

7

The record more than supports the district court's conclusion that the stop was supported by reasonable suspicion. Perez testified that he can distinguish between a normal muffler and a modified muffler because he has "plenty of experiences" differentiating between the two. R. vol. 2, 12. And Perez said that he and Elsman were speaking outside when he "heard an extremely loud exhaust and muffler echoing off the buildings." *Id.* at 14. Elsman similarly testified that he heard an extremely loud exhaust while on patrol. The officers located Ulibarri's vehicle two blocks away by merely following the sound of the car. Further, audio from Elsman's body-camera footage reveals louder-than-normal exhaust as the officers approach the vehicle. In another video, Ulibarri's mother arrives on the scene and can be heard identifying her son's car as the "loud, loud one." Supp. R. vol. 2, Ex. 15, at 00:35–40.

Despite this record evidence, Ulibarri points out that the government presented no evidence that the muffler was illegally modified. But the government wasn't required to present such evidence for two reasons. First, even if the officers incorrectly suspected that Ulibarri's vehicle had a modified muffler, "reasonable suspicion . . . need not be correct." *Vercher*, 358 F.3d at 1261; *see also United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (upholding traffic stop where officer had reasonable suspicion of car driving illegally with cracked windshield regardless of whether windshield crack was egregious enough to violate law). Second, the governing city ordinance doesn't just ban *modified* mufflers—it requires car owners to *maintain* their mufflers "in good working order of construction sufficient to prevent excessive or unusual noise." § 8-6-13(A).

8

All things considered, we have no hesitancy in concluding the officers "possess[ed] 'some minimal level of objective justification' for making the stop." *Winder*, 557 F.3d at 1134 (quoting *Vercher*, 358 F.3d at 1261).

## II.     Impoundment

Ulibarri next challenges the impoundment of his car. An impoundment is a seizure, which typically requires a warrant. But "[o]ne exception to the warrant requirement is a search or seizure conducted pursuant to police officers' 'community-caretaking functions.'" *United States v. Venezia*, 995 F.3d 1170, 1175 (10th Cir. 2021). Community-caretaking functions include vehicle impoundments, which police conduct when they "encounter disabled vehicles or investigate vehicular accidents in which there is no cause to believe that a criminal offense has occurred." *Id.* The burden is on the government to show that any community-caretaking impoundment is "supported by a reasonable, nonpretextual justification" to "guard[] against arbitrary impoundments." *United States v. Sanders*, 796 F.3d 1241, 1249 (10th Cir. 2015). Indeed, we have expressed concern that "the authority to impound a car is susceptible to abuse"—that is, "the police might impound a car as a pretext to search for evidence of a crime." *United States v. Woodard*, 5 F.4th 1148, 1150 (10th Cir. 2021).

Ulibarri argues that's exactly what happened here. Relying on the district court's finding that Perez improperly sought to investigate based on a hunch that Ulibarri's car contained something illegal, Ulibarri asserts that the officers arrested him for the sole purpose of investigating the contents of his car. But Ulibarri overlooks the district court's conclusion that Perez was also motivated by Ulibarri's

9

outstanding warrants. Thus, Perez had *mixed* motives. And we have held that mixed-motive impoundments do not run afoul of the Constitution.[2] *See United States v. Haro-Salcedo*, 107 F.3d 769, 771–72 (10th Cir. 1997) (finding impoundment reasonable in "multiple-motivation scenario" where officers impounded vehicle to identify vehicle's owner and "for further investigation by the DEA"); *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018).[3]

Not to be deterred, Ulibarri argues that even if the search was not motivated by pretext, the officers nevertheless lacked the required community-caretaking rationale to impound his car. On this point, we find guidance in *South Dakota v. Opperman*, 428 U.S. 364 (1976). There, police encountered the defendant's unoccupied car in a zone where parking was prohibited between 2:00 a.m. and 6:00 a.m., and an officer issued an overtime parking ticket at 3:00 a.m., leaving the ticket on the windshield. *Id.* at 365. Later that morning, an officer saw the car still parked and issued a second overtime parking ticket at 10:00 a.m. *Id.* at 365–66. Police inspected and towed the car. *Id.* at 366. During the inventory search, officers located marijuana. *Id.*

The *Opperman* Court upheld both the impoundment and the inventory search as reasonable under the Fourth Amendment. *Id.* at 376. The Court explained that

---

[2] Ulibarri briefly contends, without citation to authority, that we should deem mixed-motive impoundments unconstitutional. But "[w]e are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Manzanares*, 956 F.3d 1220, 1225 (10th Cir. 2020) (quoting *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam)).

[3] We cite unpublished authority for its persuasive value. *See* Fed. R. App. P. 32.1(a);10th Cir. R. 32.1(A).

community caretaking allows police to "remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *Id.* at 369. "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.*

In the face of *Opperman*, Ulibarri argues that the community-caretaking exception doesn't justify the impoundment of his car because the car "was not parked or infringing on the street itself so it posed no safety hazard to any other vehicles." Aplt. Br. 17. But the car in *Opperman* was not parked or infringing on the street itself either; it was merely illegally parked in a restricted zone. 428 U.S. at 365–66. Indeed, *Opperman* explicitly approved of police impounding cars that violate parking ordinances and thus present public-safety and traffic problems. *Id.* at 369. If this rule seems broad, that's because it is. *See United States v. Trujillo*, 993 F.3d 859, 865 (10th Cir. 2021) ("It is important to recognize the breadth of what is encompassed by 'efficient movement of vehicular traffic,' 'impeding traffic,' and 'public safety and convenience.'" (quoting *Opperman*, 428 U.S. at 369)). Indeed, "the only way in which the [*Opperman*] vehicle was impeding traffic was by reducing the number of available parking spots, perhaps requiring drivers of other vehicles to waste time and slow traffic while searching for other places to park." *Id.*

Applying *Opperman*'s broad parameters, the parking-ordinance violation at issue here justified the impoundment of Ulibarri's vehicle. The district court found (and Ulibarri does not challenge) that the car "straddled the lines of two metered

sidewalk parking spots" and thus "may [have been] subject to parking citations." R.

vol. 1, 166. Because violating parking ordinances impedes traffic by "reducing the

number of available parking spots," *Trujillo*, 993 F.3d at 865, Ulibarri's vehicle was

impeding traffic. The officers thus had a valid community-caretaking rationale for

impounding the vehicle upon Ulibarri's arrest.[4]

In sum, we agree with the district court that the officers' decision to arrest

Ulibarri and impound his car—though partially motivated by improper investigatory

intent—does not run afoul of the Fourth Amendment because the officers had a valid

community-caretaking rationale.[5]

---

[4] Ulibarri urges us to apply *Sanders*'s test for impoundments, which supplies
five nonexclusive factors to ascertain whether police officers have presented a
reasonable, nonpretextual community-caretaking rationale for an impoundment. 796
F.3d at 1249–50. But *Sanders* doesn't address public-safety or traffic-impediment
impoundments. There, "[t]he vehicle was legally parked in a private lot, and there
[wa]s no evidence that it was either impeding traffic or posing a risk to public
safety." *Id.* at 1250. This case is instead governed by *Opperman*, which—as we've
discussed—similarly concerned a car illegally parked on a public street. 428 U.S. at
365–66. And despite the district court's suggestions to the contrary, this approach
conforms with our decisions in *Trujillo* and *Venezia*. *Trujillo* properly analyzed the
impoundment of a vehicle from a public road without applying the five *Sanders*
factors. 993 F.3d at 861–62, 871–72. And *Venezia* applied *Sanders* in the context of a
private-property impoundment while acknowledging that "*Sanders* does not apply to
impoundments where there is a 'threat to public safety or traffic.'" 995 F.3d at 1175
n.1 (quoting *Trujillo*, 993 F.3d at 872). Thus, we decline to apply *Sanders* here, and
for that reason, we need not address Ulibarri's arguments about possible alternatives
to impoundment. *See* 796 F.3d at 1250 (listing alternatives to impoundment as
relevant factor for validity of private-property impoundments).

[5] Because we find that the officers had a valid community-caretaking rationale
in impounding Ulibarri's car, we need not consider Ulibarri's challenge to the district
court's alternative community-caretaking rationale: the presence of a gun in the
vehicle.

### III.    Inventory Search

Last, Ulibarri argues that the inventory search violated the Fourth Amendment. "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372. "An inventory search 'does not offend Fourth Amendment principles so long as the search is made pursuant to standard police procedures and for the purpose of protecting the car and its contents.'" *United States v. Kendall*, 14 F.4th 1116, 1124 (10th Cir. 2021) (cleaned up) (quoting *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992)). But "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

Here, the inventory search turned up a handgun, a rifle, a magazine, $10,000 in cash, and drugs, but the tow-in report only listed the handgun, rifle, and "paraphernalia"—no mention of the cash. Supp. R. vol. 1, 5 (cleaned up). In Ulibarri's view, the failure to mention the $10,000 in cash shows the tow-in report was merely an afterthought and demonstrates pretext. The district court agreed that the search was "not flawless," R. vol. 1, 278, but it nevertheless found that the inventory search "conformed largely to [department] policy," *id.* at 280.

We agree with the district court that the missing pieces of the tow-in report are not dispositive here. As the government points out, "[a]n inventory list . . . need not

be perfect to be constitutional." Aplee. Br. 50. In *Bertine*, the district court had noted that the police performed the inventory search "in a 'somewhat slipshod' manner" because they failed to list certain items found during the inventory search. 479 U.S. at 369. The Supreme Court nevertheless held the search reasonable because "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." *Id.* at 372.

So too here. Department policy required the officers to inventory the car's interior once they decided to tow it and to document the results of the inventory search on a tow-in report. The officers searched the interior and completed a tow-in report as required, largely complying with department policy. To be sure, the documentation effort leaves something to be desired. Yet if a "slipshod" inventory qualifies as "following standardized procedures," then the officers' effort in this case also passes constitutional muster. *Bertine*, 479 U.S. at 369, 372; *see also United States v. Lopez*, 547 F.3d 364, 370–71 (2d Cir. 2008) (finding inventory search reasonable even though officers did not list every item because "itemization of every object found in the car" has no bearing on "Supreme Court's requirement of a standardized policy"). Further, Ulibarri has presented no evidence of bad faith or that the officers' motives were *solely* investigatory. *Bertine*, 479 U.S. at 372.

In sum, because the officers conducted an inventory search imperfectly but according to department policy, the search was reasonable.[6]

---

[6] Ulibarri also challenges the inventory search because there was "no need to protect the items in the car." Aplt. Br. 24. Ulibarri insists he was trying to make other

## Conclusion

The traffic stop was supported by the officers' reasonable suspicion of excessive vehicular noise. And the officers had a valid community-caretaking rationale to impound Ulibarri's car, which was parked illegally on a public street with no readily available driver. Upon impoundment, police-department policy required an inventory search, and the search followed that policy, even though the officers failed to document every item inventoried.

Having rejected each of Ulibarri's Fourth Amendment challenges, we affirm the denial of his motion to suppress.

---

arrangements to remove the car from the street and "there were no valuable items in plain view." *Id.* But Ulibarri's effort to make other arrangements is immaterial to the reasonableness of the inventory search. Once the officers decided to tow the car, department policy mandated an inventory search.