**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roger Glen KORNEGAY, a/k/a Richard Sanchez, Defendant–Appellant.**

No. 88–1800.

United States Court of Appeals, Tenth Circuit.

Sept. 25, 1989.

Lynda Burris Linscott, Asst. U.S. Atty. (Roger Hilfiger, U.S. Atty., with her on the Brief) Muskogee, Okl., for plaintiff-appellee.

Stephen J. Greubel, Asst. Federal Public Defender, David Booth, Federal Public Defender, Tulsa, Okl., for defendant-appellant.

Before McKAY and ANDERSON, Circuit Judges, and BRATTON, Senior District Judge.*

BRATTON, Senior District Judge.

Appellant Roger Glen Kornegay (Kornegay) was convicted in the court below of interstate transportation and sale of a stolen farm tractor, in violation of *18 U.S.C., §§ 2312, 2313.* On appeal he urges as grounds for reversal, first, that the court below erred in failing to grant his motion to suppress evidence he claimed was seized during an illegal search, and, second, that the court below erred in denying his motion

---

* Honorable Howard C. Bratton, Senior United States District Judge for the District of New Mexico, sitting by designation.

for a mistrial, which he based upon intentional misconduct by the prosecutor.

Evidence adduced at the hearing below on the motion to suppress established that the indictment and conviction in the instant case actually grew out of an investigation conducted in another matter. One Gary Milton (Milton), an employee of an auction company in Howe, Texas, called the FBI and told Agent James Blanton that an individual named Richard Sanchez had consigned two tractors to the auction company and had requested that the proceeds of their sale be mailed to him in care of Triple S Farms at a post office box in Lone Star, Texas. The tractors had been sold, but the auction company employee had become suspicious about the tractors and was concerned about sending to a post office box a check for the substantial amount of money realized from the sale.

Agent Blanton got in touch with the John Deere Company and discovered that the tractors had been stolen. He was unable to locate or identify the person who called himself Richard Sanchez and who had consigned the tractors to the auction company. In the small town of Lone Star, Texas, the agent could find no one who knew of a Richard Sanchez or Triple S Farms. He told Milton not to mail the check and, if Sanchez called, to tell him he must pick up the check in person.

A man identifying himself as Richard Sanchez subsequently called the auction company about the proceeds of the sale, and Milton, pursuant to Agent Blanton's directive, told him he would have to come in person and get his check from the auction company.

The next day Kornegay came to the auction company, parked his auto in the parking lot of the company, entered the building, and identified himself as Richard Sanchez. He was given the check by Milton, whereupon the FBI agents, who had been observing the transaction, placed him under arrest.

Kornegay told the agents that he was Richard Sanchez and showed them a driver's license issued to a person of that name. The agents advised him that it was not his picture on the license. When the agents escorted him from the building, he identified his auto for them, and the agents noticed that a Missouri plate had been temporarily fastened over a Louisiana plate on the vehicle. They asked permission to inventory his automobile, since they were going to take him to jail, and they wanted to secure any valuables before the vehicle was towed to the impoundment lot.

Even though permission was refused, an inventory of the vehicle was begun by a Texas state auto theft specialist who had accompanied the agents to the auction company. He conducted the inventory using a standard inventory form. A blue bank bag lying on the front seat was picked up and opened. It contained ten thousand dollars in cash, jewelry, and several wallets and sets of identification. After these items were removed, the vehicle was towed to the impound lot by a wrecker.

The agents conducted a search of the impounded vehicle later that day after they had obtained a search warrant from a United States Magistrate. The search of the vehicle produced documents that showed the transportation of tractors across various states, gas receipts, and a legal pad with notations showing where various pieces of equipment had been disposed of, including a notation regarding the sale in Idabel, Oklahoma, of the tractor, stolen in Mississippi, that is involved in the instant case.

Further investigation in the case revealed that the man calling himself Richard Sanchez was in fact Kornegay.

The claim is made here, as it was in the court below, that the warrantless inventory search of his automobile, done without his consent, was unreasonable since his car was parked in the auction company's parking lot, it was not blocking traffic, and its removal had not been requested. In essence, his argument is that, under these circumstances, there was no need to move or to inventory the auto, and his refusal to consent to an inventory relieved the agents of any potential liability for failure to protect his property. His further argument is that, even if the inventory was proper, the

bank bag should have remained unopened and have been inventoried as a unit.

■ The first question to be decided is whether the agents' decision to impound the vehicle was proper. The arrest of Kornegay took place inside the building, i.e., he was not arrested while in or near his automobile. Further, the auto was parked in the company's parking lot and was not in any manner illegally parked. Nor had the auction company requested its removal.

It is argued that, under such circumstances, *United States v. Pappas*, 735 F.2d 1232 (10th Cir.1984), is controlling. In *Pappas*, the defendant's car was legally parked in the parking lot of a local bar at the time of his arrest and removal from the scene. The defendant had had with him a lady friend who could have driven the car to the police station. He had other friends present who could have been asked to take the car into custody. He was a well known person in the community. His family lived close by and could have been called to take care of the car. The bar owner could have been asked if defendant's car could be left in the bar's parking lot until he returned. The trial court found that these alternatives to impoundment sufficiently protected the officers from any potential claims against them and suppressed evidence found in an inventory search of defendant's auto, and the court's decision was affirmed on appeal.

The facts in the present case differ appreciably from those in *Pappas*. First, the agents here arrested a person whose real identity they did not know. Second, they did not know where he lived. Indeed, they had been unable to identify him as coming from Lone Star, the place of residence he had listed with the auction company. Third, he was alone, and there was no friend, relative or companion who could be asked to care for the car. Fourth, they did not know where the vehicle was from. Fifth, the vehicle was not parked on his property, and the agents had every reason to believe that he would not be returning anytime soon to the auction company's lot to care for it himself. Sixth, to have left the vehicle in the auction company's park-ing lot—a lot open to the public—could have subjected it to vandalism or theft. The fact that the vehicle was legally parked in a parking lot does not, in and of itself, require the finding that impoundment was unnecessary, see *United States v. Staller*, 616 F.2d 1284 (5th Cir.1980), cert. denied, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *United States v. Gravitt*, 484 F.2d 375 (5th Cir.1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974), and the court in *Pappas* recognized this. In *Staller*, the automobile was legally parked but there was no one available to take custody of it; the defendant was unable to care for it by virtue of his arrest; and there was the potential for theft or vandalism present. Indeed, the court in *Pappas* distinguished *Staller* on that basis. 735 F.2d at 1234.

There is no evidence that suggests that the agents' decision to impound the car was other than proper and reasonable under the facts of this case.

This leaves the question of whether the inventory search was necessary and, if necessary, was extended too far by the opening of the bank bag.

The Supreme Court has addressed these issues and has established principles and guidelines to apply to inventory searches.

The Court has held that inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment, and, inasmuch as inventory searches are routine noncriminal procedures, they are to be judged by the standard of reasonableness under the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 372, 96 S.Ct. 3092, 3098–99, 49 L.Ed.2d 1000 (1976). In *Opperman*, the Court set out the principles governing inventory searches. In that case, the contents of an automobile that had been towed to the city impound lot for overtime parking were inventoried by a police officer, including the unlocked glove compartment, where he found a bag of marihuana. The owner was subsequently arrested on charges of possession of marihuana, his motion to suppress the evidence garnered in the inventory was denied, and he was convicted. The

state supreme court reversed, concluding that the evidence had been obtained in violation of the Fourth Amendment prohibition against unreasonable searches and seizures. The Court reversed the state court's decision, holding that the routine practice by police of securing and inventorying the contents of an automobile did not involve an unreasonable search under the Fourth Amendment. The Court found such standard procedures to serve the strong governmental interests in protecting the property while it was in police custody; in protecting the police from claims about lost or stolen property; and in protecting the police from potential danger.

In *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the Court addressed the issue of the propriety of yet another inventory search. In *Bertine*, the owner of a van was arrested for driving while under the influence of alcohol. The police inventoried the van after his arrest and before it was removed to an impoundment lot. A backpack was found directly behind the front seat of the van and was opened by a police officer. Inside was a nylon bag containing metal canisters. The canisters were removed from the bag and opened, and narcotics were found. Currency was found in a sealed envelope located in an outside zippered pouch of the backpack. The Court upheld the inventory search, citing *Opperman* and *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), a case in which it had upheld as reasonable an inventory search of the contents of a shoulder bag in the possession of someone being taken into custody, on the basis that it served the same kind of legitimate governmental interests as those identified in *Opperman.* The Court in *Bertine* also concluded that discretion exercised by the police in impounding the van rather than parking and locking it in a public parking place was permissible so long as that discretion was exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.

Relying upon *Opperman* and *Bertine,* the court below concluded that the inventory was reasonable in that it was done pursuant to standard procedures and for the purposes of securing the vehicle, protecting Kornegay's property, and protecting the agents from potential danger and claims for lost, stolen, or vandalized property. The court also found that the opening of the bank bag was reasonable, since the inventory would require an itemized account of all property held by the agents and for which they were responsible. The court further found that the fact that the vehicle could have been locked and left in the parking lot did not establish the unreasonableness of the inventory in the absence of a showing of a desire on the part of the agents to investigate criminal activity rather than to conduct a routine inventory of the vehicle of one who had been arrested and was going to be taken to jail.

■ The record supports the district court's conclusions regarding the inventory of the vehicle. Testimony at the suppression hearing showed that an initial routine inventory was conducted pursuant to standard procedures by a specialist in attendance for that purpose. The bank bag was opened and its contents itemized so that the inventory would accurately reflect all of the property for which the agents would be responsible. They did the inventory because they were obligated to secure the vehicle's contents. The record reflects no written regulation requiring this, but the testimony of Agent Blanton established that it is the customary and standard practice when a vehicle is impounded. The record contains no showing that the inventory was a pretext used to investigate for evidence of criminal activity. On the contrary, it reflects that the opening of the bank bag and the separate cataloguing of its contents was a standard practice and was reasonable, serving as it did the strong governmental interests of protecting Kornegay's property while it was in official custody and insuring that no claims could be made that it had been lost, stolen or vandalized.

The second claim of Kornegay, who represented himself at trial and did not take the witness stand, revolves around the con-

duct of the Assistant United States Attorney who tried the case in the court below.

The alleged misconduct occurred during the prosecution's questioning of a government witness. The witness had had an intimate relationship with Kornegay, whose name she believed to be Craig Fleshman, during the three months preceding his arrest.

In response to prosecution questions, the witness revealed on direct examination that the man she knew as Craig Fleshman had evoked her sympathy by telling her that his wife had died in an accident and that he had a little girl who was living with his wife's parents and was to be adopted by them. She was then asked if she had come to know whether he had told her the truth. Kornegay objected to the question as an attempt by the prosecution to place his reputation and character in issue. In the dialogue at the bench concerning the objection, the court sustained the objection, characterizing the questions concerning what Kornegay had told the witness about his background and the objectionable question about whether he had been truthful as "trash".

The prosecutor's first question on re-direct was a second attempt to elicit from the witness the information that Kornegay had lied to her about his family and background. Again, an objection was sustained.

Three questions later, the witness was again asked if she had found out whether Kornegay had given her false information. Upon her response in the affirmative, she was asked to specify what false information he had given her, and she again referred to the marriage and child, stating that he had never been married and did not have a child.

At this point another objection was registered, and a motion for a mistrial was made after the jury was excused for the lunch-hour recess. The court reprimanded the prosecutor for failure to follow his directives but found the matter not so prejudicial as to require him to declare a mistrial.

After the noon recess and before the jury had returned to the courtroom, the Assistant Public Defender, who had been sitting at counsel table with Kornegay throughout the trial, was given permission to address the court on the issue of the prosecutor's improper conduct. He argued that, since it was intentional, it was ground for a mistrial. The court agreed that the prosecutor's conduct was improper and intentional but found that the testimony was inter-related with other testimony and was evidence of another bad act rather than evidence of another crime, so that the prosecutor's misconduct was not sufficiently prejudicial to require a new trial.

When the jury returned to the box the court directed that the members of the jury not consider the last question put to the witness and her answer in their deliberations in the case.

On appeal it is claimed that this conduct by the prosecutor amounted to a comment on Kornegay's failure to take the stand and appealed to the passion or bias of the jury, denying him a fair trial.

The question for resolution is not the culpability of the prosecutor but, rather, the fairness of the trial. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). It is the duty of the reviewing court to consider the trial record as a whole and to ignore errors that are harmless beyond a reasonable doubt, including most of those involving constitutional violations. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). Prosecutorial misconduct alone does not require a new trial. *Smith v. Phillips,* 455 U.S. at 220, 102 S.Ct. at 948.

A determination must be made whether the alleged misconduct was in fact error, and, if so, whether it requires reversal or whether it was harmless beyond a reasonable doubt. *United States v. Record,* 873 F.2d 1363, 1376 (10th Cir.1989); *United States v. Martinez–Nava,* 838 F.2d 411, 416 (10th Cir.1988). Only when misconduct can present a question of whether it influenced the jury's verdict does the failure to take appropriate steps to remove

it require reversal. *Marks v. United States*, 260 F.2d 377, 383 (10th Cir.1959), *cert. denied* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959). There is no need to examine in depth the existence of error where the record convincingly shows that the asserted error, whether or not actually error, was harmless beyond a reasonable doubt. *United States v. Record*, 873 F.2d at 1376; *United States v. Martinez-Nava*, 838 F.2d at 416. Under the harmless error doctrine, prosecutorial misconduct is evaluated by examining the court's actions with regard thereto, the extent of the misconduct, and its role within the case as a whole. *Id.*

In the present case, the district court gave a specific directive to the jury to disregard the offending evidence shortly after it was offered, before any other evidence intervened, and before the jury began deliberations. Further, there was no other like reference made or like question asked of anyone by the prosecutor. Finally, the evidence of guilt was so extensive that the challenged testimony could not been of critical, if any, importance to the jury's verdict. In short, the record reflects that the prosecutorial misconduct complained of here was harmless beyond a reasonable doubt.

It should be noted that the above conclusion does not justify prosecutorial misconduct, but, accepting what happened here as improper, what is called into question is the competence and judgment of the prosecutor, not the fairness of the trial. *See United States v. Hasting*, 461 U.S. at 512, 103 S.Ct. at 1982.

AFFIRMED.

McKAY, Circuit Judge, dissenting:

I regret I cannot join in the court's opinion. There are two impediments. The first is the court's conclusion that an inventory search of the automobile was justified over explicit objection. The key analytical problem is the court's assertion that "it was necessary to secure the vehicle and its contents." It is, of course, fairly settled that when officers remove a defendant from his car and arrest him, they can take steps to secure the car. I would assume we would not uphold the arrest of a shoplifter in a store and allow the police to inquire where his or her car is parked and then find the car and determine it "necessary to secure the vehicle and its contents." In this case, the defendant had parked his car in a lawful place and left it there to go inside to do business. It was there that he was arrested. I believe it goes well beyond any established Supreme Court precedent and beyond logic to ratify an "inventory" search based on the assertion that securing this vehicle under these circumstances was either necessary or permissible. The suggestion of some police duty to the car here argues too much. It was not unlawfully parked. It was not a traffic hazard. They had not stopped him while driving or otherwise removed him from his car. His arrest was no more associated with this car than the arrest of a shoplifter would be associated with his or her car. The facts of this case make what one often suspects is pretext, patent.

We previously invalidated an inventory search, under similar circumstances, in *United States v. Pappas*, 735 F.2d 1232 (10th Cir.1984). There the defendant was indicted for possession of an illegal weapon found in his car. The evidence was conflicting as to whether the defendant entered his car prior to the arrest. The arresting officer testified that the defendant had entered the vehicle. At a minimum defendant was headed toward the car and about to enter it. In that case there was clearly a closer nexus between the defendant and the inventoried vehicle. We held that while the protective search of the compartment in defendant's car was reasonable, that initial search did not "extend to the inventory search of defendant's car." *Id.* at 1234. We distinguished *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976):

> *Opperman* cannot be used to justify the automatic inventory of every car upon the arrest of its owner. The justifications for the rule are too carefully crafted for this to be the intent. In this case the car was parked on private property and there was no need for the impound and inventory search.

*Id.* at 1234. There was likewise no need for the impound and inventory here.

I am also unable to agree that the willful introduction of inadmissible evidence over specific court instruction is harmless. While we often indulge the tenuous notion that a curative instruction in fact removes taint and often suggest that after the prosecutor has battled tooth-and-nail to get inadmissible evidence before the jury that it didn't influence the verdict, I don't think that is what we are really saying. Basically I believe we are just acknowledging that some mistakes have to be borne by defendants. In this case I believe we should not extend that principle which puts the burden of risk on the defendant where that risk was willfully created. While there is substantial evidence of guilt, the prosecutor knew that and still felt very strongly that this inadmissible evidence was important in persuading the jury. The court found that the prosecutor's conduct was willful. The court, by its cautionary instruction to the jury, puts the lie to any suggestion that it admitted this evidence as proper. I simply am unable to say that something so important to the prosecutor that she three times brought it before the jury, twice risking contempt, is harmless beyond a reasonable doubt. I just cannot say that a jury would not be influenced by this evidence in what otherwise appears to be a strong case.

I would grant a new trial.