**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 15, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

    No. 23-6071

ISAAC MANUEL RAMOS,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:22-CR-00180-JD-1)**

_____

Shira Kieval, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant – Appellant.

Wilson D. McGarry, Assistant United States Attorney (Robert J. Troester, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff – Appellee.

_____

Before **BACHARACH**, **BALDOCK**, and **MURPHY**, Circuit Judges.

_____

**MURPHY**, Circuit Judge.

_____

## I. INTRODUCTION

Frederick Police Department ("FPD") Officer Jose Puentes arrested Isaac Ramos and impounded Ramos's truck. In anticipation of the truck's impoundment, Puentes conducted an inventory search. That search revealed the presence of a

machine gun and ammunition. A federal grand jury issued a two-count indictment charging Ramos with unlawful possession of a machine gun, in violation of 18 U.S.C. § 922(o), and being a felon illegally in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). Ramos moved to suppress the machine gun and ammunition, asserting the impoundment of his truck violated the Fourth Amendment because it was not consistent with standardized policy and not supported by a reasonable, non-pretextual community-caretaking rationale. After the district court denied his motion to suppress, Ramos entered a conditional guilty plea to the unlawful-possession-of-a-machine-gun charge. Fed. R. Crim. P. 11(a)(2). On appeal, Ramos claims the district court erred in refusing to suppress the machine gun as the product of an illegal search, reasserting the arguments he made in the district court.

This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **reverses** the denial of Ramos's suppression motion. We need not resolve whether the impoundment of Ramos's truck was consistent with FPD policy. Instead, it is sufficient to conclude impoundment was not supported by a reasonable, non-pretextual community-caretaking rationale. *United States v. Sanders*, 796 F.3d 1241, 1243 (10th Cir. 2015) (holding that to be valid under the community-caretaking doctrine, an impoundment must be *both* consistent with standardized policy and supported by a valid community-caretaking rationale). The matter is **remanded** to the district court to grant Ramos's suppression motion and to conduct any further necessary proceedings.

2

## II. BACKGROUND

### A. Legal Background

The Fourth Amendment protects the "right of the people to be secure in their . . . effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Vehicles are effects that fall within the Fourth Amendment's protection. *Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971) ("The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears."). "To be reasonable, a search generally requires the obtaining of a judicial warrant." *United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021) (quotation omitted). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). One such exception, and the only exception at issue here, is a search conducted pursuant to a police officer's "community-caretaking function." *Venezia*, 995 F.3d at 1175. This exception allows law enforcement to impound an automobile and, in connection with the impoundment, inventory the vehicle's contents. *Sanders*, 796 F.3d at 1244–45. Such an impoundment, however, must be based on "something other than suspicion of evidence of criminal activity," such as "protecting public safety and promoting the efficient movement of traffic." *Id.* at 1245 (quotation omitted); *see also United States v. Chavez*, 985 F.3d 1234, 1243 (10th Cir. 2021) (holding that "public safety lies at the heart" of the community-caretaking doctrine). That is, a community-caretaking impoundment cannot be based on a suspicion or hope evidence of criminal activity

3

will be found in the vehicle. The government has the burden of proving a vehicle impoundment satisfies the Fourth Amendment. *Sanders*, 796 F.3d at 1244.

The community-caretaking exception to the Fourth Amendment's warrant requirement operates differently depending on the nature of the property from which the vehicle is impounded. When the vehicle is located on public property, specifically including streets, roads, and ways, officers have far greater authority to impound. *See Venezia*, 995 F.3d at 1175; *see also generally South Dakota v. Opperman*, 428 U.S. 364 (1976); *Cady v. Dombrowski*, 413 U.S. 433 (1973); *United States v. Trujillo*, 993 F.3d 859 (10th Cir. 2021). When, on the other hand, police impound a car located on private property, and that car is neither "obstructing traffic or creating an imminent threat to public safety," a community-caretaking rationale "is less likely to exist." *Venezia*, 995 F.3d at 1176, 1178. In such situations, this court imposes "heightened requirements on police." *Sanders*, 796 F.3d at 1249. To be consistent with the Fourth Amendment, such an impoundment must be "justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." *Id.* at 1248.[1] A

---

[1] This court's precedents identify these two requirements as *Sanders*'s first (justified by a standardized policy) and second (reasonable, non-pretextual community-caretaking rationale) prongs. What makes the requirements for impoundment in the private property context "heightened" is *Sanders*'s first prong. *See Venezia*, 995 F.3d at 1178. *Sanders*'s second prong, on the other hand, "appl[ies] to all community-caretaking impoundments." *Id.* (quotation omitted). This is true "because protection against unreasonable impoundments, even those conducted pursuant to a standardized policy, is part and parcel of the Fourth Amendment's guarantee against unreasonable searches and seizures." *United States v. Kendall*, 14 F.4th 1116, 1123 (10th Cir. 2021) (quotation omitted). As set out *infra*, when analyzing whether a given impoundment satisfies *Sanders*'s second prong, this court considers five non-exclusive factors.

failure to satisfy either criterion is sufficient to establish that the impoundment, and related inventory search, is unconstitutional. *Id.* at 1243.

Ramos asserts on appeal that the impoundment of his truck fails both requirements set out in *Sanders*. This court need not resolve whether the impoundment was consistent with FPD policy because, in any event, it is not supported by a reasonable, non-pretextual community-caretaking rationale. *See United States v. Braxton*, 61 F.4th 830, 835 & n.3 (10th Cir. 2023) (resolving appeal solely on basis of *Sanders*'s second prong and emphasizing that both *Sanders* requirements must be satisfied for a community-caretaking impoundment to pass Fourth Amendment muster). Law enforcement must take "objectively reasonable" action in its community-caretaking role and must do so pursuant to a non-pretextual "subjective motivation." *Kendall*, 14 F.4th at 1128; *see generally United States v. Woodard*, 5 F.4th 1148, 1155–59 (10th Cir. 2021). This court has identified "five non-exclusive factors" that are helpful to determining "whether an impoundment is justified by . . . a reasonable, non-pretextual community-caretaking rationale." *Venezia*, 995 F.3d at 1177. These factors include:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Sanders*, 796 F.3d at 1250. Although this court weighs the *Sanders* factors de novo, "we review the district court's factual findings for clear error and view the evidence in the light most favorable to the government." *Woodard*, 5 F.4th at 1155.

**B. Factual Background**[2]

At 11:51 p.m. on February 13, 2022, FPD Officer Puentes responded to a call about a public disturbance at the Hop & Sack Convenience Store. The Hop & Sack is located at the intersection of 14th Street and Gladstone Avenue; Gladstone Avenue is also State Highway 5. Puentes observed two men involved in a physical altercation in the parking lot. Puentes separated the combatants, recognizing both men, Ramos and Caleb Hogan, as his former classmates.[3] As Puentes was pulling Ramos off to the side, Ramos turned and "lightly tapped" him on his right cheek. At that moment, Puentes placed Ramos under arrest for assault and battery on a police officer. Puentes placed Ramos in handcuffs and detained Ramos in the backseat of his patrol car. Puentes spoke with Hogan to get his side of the story. Puentes described Hogan as the victim because when Puentes arrived on the scene, he saw Hogan walk toward his vehicle as Ramos followed and then instigated the altercation.

---

[2] The district court's factual findings are set out in 202 numbered paragraphs spread over 35 pages. This court sets out only those facts relevant to the second part of the *Sanders* inquiry. In so doing, as discussed further below, we do not summarize the extensive findings regarding how Hop & Sack employees or management might have reacted if Puentes would have consulted them regarding their preferred disposition of Ramos's truck. *Woodard*, 5 F.4th at 1155–56.

[3] The Town of Frederick spans less than five square miles. Ramos had lived in Frederick most of his life and was well known to the people in Frederick.

FPD Assistant Chief Joe Rodriguez arrived on scene after Puentes detained Ramos and while Puentes was talking to Hogan. Puentes already had control of the scene and was visiting with witnesses when Rodriguez arrived. Rodriguez assisted Puentes with the investigation and consulted with Puentes about the charges and what to do that night.

Once Puentes had Ramos in custody, he considered towing or impounding Ramos's vehicle. Puentes described his decision as "protocol," meaning "as soon as I arrest someone, and no one is around, I'll impound their vehicle." By 11:59 p.m., Puentes decided he was going to impound the vehicle. His decision never changed and was based solely on the fact he had arrested Ramos.[4]

Ramos was driving a tow truck, which was parked on the east side of the Hop & Sack. The Hop & Sack closes at midnight and it was past midnight when Puentes asked Ramos if he needed anything out of his truck. Ramos responded he had everything he needed and indicated the truck belonged to his mother.[5] When Puentes

---

[4] To be clear, the vehicle was unrelated to the reason for Ramos's arrest and was not needed for evidence.

[5] Puentes knew Ramos's mother, Lupe Juanes, since he was a child. Puentes acknowledged Juanes resided about three blocks from the Hop & Sack, a one-minute drive. Similarly, Rodriguez has known Juanes his entire life, as they both grew up in Frederick. Rodriguez also recognized Juanes lived near the Hop & Sack, about three blocks away. In contrast, the closest towing service was ten blocks away. Rodriguez conceded that if Juanes was home and awake, she could have arrived at the Hop & Sack quickly if the officers had called her. Indeed, Juanes testified that if the officer had called her to pick up the truck, she would have been at the Hop & Sack in three minutes.

asked if Juanes was home, Ramos shook his head yes. Ramos asked if he could call Juanes to come pick up the truck. Puentes did not answer yes or no to Ramos's request because his plan was to first check the vehicle's registration. Puentes never called Juanes, despite admitting he could have obtained her phone number from Ramos. Puentes asked Rodriguez whether he should let Juanes come get the truck. Rodriguez deferred to Puentes, but suggested they first see whether the vehicle registration came back to Juanes. Puentes and Rodriguez were considering releasing the vehicle to Juanes, but needed to see if the vehicle was registered to her because their "protocol" was "to release the vehicle to the registered owner."[6]

While the officers were discussing whether to release the vehicle to Juanes, Puentes discovered the truck had no license plate displayed. Rodriguez then advised Puentes to call a tow truck. Rodriguez recognized it was Puentes's call whether to call a tow truck but indicated he was the supervisor on the scene, so he was advising Puentes. When he discovered no license plate was displayed on the truck, Puentes concluded it was irrelevant whether the vehicle was registered to Juanes because it could not be lawfully driven on the roadway without a license plate displayed and, without a license plate, the police could not confirm the vehicle's registration. Further, Ramos was alone, Juanes was not at the scene, and Puentes suspected Ramos was intoxicated.

---

[6] Puentes did not attempt to defend this "protocol" during the suppression hearing. Instead, he agreed that family members may be entrusted with a vehicle with the permission of the driver and that Ramos had asked him to release the truck to Juanes.

8

Puentes testified he would not leave the truck parked at the Hop & Sack overnight because the FPD would be liable if the vehicle were burglarized or vandalized while Ramos was in police custody. He also indicated the truck's engine was still running at the time.[7] Additionally, Puentes would not leave the truck parked at the Hop & Sack overnight because the store had a posted sign that prohibited parking to non-customers. Puentes believed Ramos was no longer a customer because it was fifteen minutes past midnight and the store closed at midnight.[8] Although Puentes had never towed a vehicle from the Hop & Sack before, he believed it would be the store manager's decision whether the truck could remain parked there overnight. Puentes had no information indicating Ramos had permission from the store manager to leave his vehicle overnight.

After deciding to impound the truck, Puentes asked Rodriguez to transport Ramos to the jail so he could remain at the scene. As Ramos got into the back of Rodriguez's patrol car, Puentes asked him about the missing license plate. Ramos indicated it was likely in the truck behind the seat but could also be in his other truck.

---

[7] In its brief on appeal, the government repeatedly emphasizes this fact. It is, however, mentioned only one time in the district court's order: it appears as a single sentence in the district court's summary of Puentes's testimony. Puentes did not testify this fact played a meaningful role in his decision to impound Ramos's truck and it played no part in the district court's analysis of the five *Sanders* factors. In any event, for those reasons set out *infra* in notes 13 and 22, the fact Ramos's truck was running is of no significance to the resolution of this appeal.

[8] Nevertheless, Puentes acknowledged Ramos purchased merchandise from the Hop & Sack and that his vehicle was lawfully parked on the east side of the store in a private parking lot, where it posed no impediment to traffic. Rodriguez likewise testified Ramos's vehicle was parked in a legal parking spot on private property.

Puentes looked for the license plate in the truck, eventually finding it behind the passenger seat. Puentes prepared to run a check on the license plate, but he did not put the license plate back on the truck.[9] Puentes testified he had never done that before or heard of a police officer doing so. He also indicated there could be liability issues if an officer were to damage the truck remounting the plate. Puentes called the license plate number into dispatch; the dispatcher advised that the license plate return came back to Ramos's truck with an expiration date of November 30, 2022. The dispatcher also advised that the insurance was confirmed. The dispatcher did not indicate the vehicle was registered to anyone else besides Ramos.[10]

After Rodriguez and Ramos left in the patrol vehicle for the jail, Puentes obtained a written statement from the store clerk, Jessica Ward. Puentes did not ask for Ward's permission to tow Ramos's truck. It was not on his mind, he did not think to ask, and, in his view, it would not have mattered because it would have been up to the store manager whether Ramos could leave his vehicle overnight. Rodriguez,

---

[9] Although the record is not entirely clear, it appears Ramos was displaying the license plate on the rear window of the trunk, rather than on the rear bumper. Puentes testified a license plate must be mounted on the back bumper. Ramos's vehicle had tinted glass, meaning the plate may not have been visible in the back window. Puentes noted it was dark that night and he did not place the license plate in the back window to determine whether it was visible.

[10] Later that evening, after the truck had already been inventoried and released to the towing company, officers learned Ramos's mother was one of the registered owners of the vehicle. Puentes testified this information would not have changed his impoundment decision because (1) the license plate was not properly attached to the vehicle and (2) he is required not to cancel a tow truck once one has been called because the tow trucks are on an on-call rotation.

likewise, did not consult with any Hop & Sack employee about leaving Ramos's vehicle at the store overnight. Rather, he acted based on the store's posted sign[11] and his past experience in being called out to tow vehicles left in the Hop & Sack parking lot. He testified there have been a few times over the years when someone was arrested and the store personnel did not want the arrestee's vehicle left on the property because they did not want to be responsible for damages. There had been other times when a vehicle was "abandoned" and the store clerk or manager did not know why the vehicle was left there or who it belonged to, so they called the police to come out and tow the abandoned vehicle. Rodriguez admitted he could not recall a specific instance or specific year in which he was called out to the Hop & Sack to tow a vehicle, or a specific employee with whom he spoke.[12] He further indicated that there has "been a time or two" when an individual left their vehicle overnight with the Hop & Sack's permission.

Subsequently, Puentes inventoried the contents of the vehicle to ensure the FPD was not liable if something came up missing once the truck left their possession. Puentes estimated he conducted the inventory around 12:25 a.m. This was after he had called the towing company. While conducting the inventory search, Puentes found a loaded M-16 firearm behind the driver's seat. Meanwhile, as he was being

---

[11] A sign posted in the window of the Hop & Sack read as follows: "Customer Parking Only Violators Towed."

[12] In contrast to Rodriguez's testimony, the Hop & Sack's manager could not recall another vehicle being impounded from the Hop & Sack in her 22.5 years of working there.

booked into the jail, Ramos received a call on his cell phone. He told the caller to contact Juanes. Juanes arrived at the Hop & Sack after Puentes completed his inventory of the truck, but approximately fifteen minutes before the tow truck arrived. Puentes advised her that the tow truck was enroute and it was too late to cancel the tow.[13]

The record contains significant detail about the Hop & Sack and surrounding neighborhood. Several businesses are located near the Hop & Sack, including the United Supermarket, the Tillman County Courthouse, Allsup's Convenience Store, Security Finance, a radio station, a laundromat that closes at 10:00 p.m., and a hair salon or barbershop. The remainder of the streets are occupied by residential housing. The proximate businesses have "fairly decent" lighting at night. As to the Hop & Sack itself, Puentes testified he was familiar with its features and hours of operation. After the store closes for the night, a few lights are left on. The gas pumps are, however, always open to anyone purchasing gas with a credit card. Overall, except for the gas pumps, the area is not well lit at night. The officers testified, inter alia, that there was a significant amount of crime in the area, the vehicle was accessible to

---

[13] According to Puentes, he had alternatives to towing until he learned the truck did not have a license plate displayed. He, nevertheless, agreed he could have called Juanes after he learned the license plate was validly registered to the truck, she could have put the license plate on the truck, and it would have then been legal to drive. Puentes further acknowledged that at no point before he called the tow truck did he ask Ramos if he would consent to leaving his truck at the store until someone could come pick it up. Finally, Puentes agreed that if the police had released the vehicle to Juanes, this would have relieved the police of any liability. Juanes testified, without contradiction, that she could have attached the license plate to the truck with the tools already present in the vehicle.

heavy foot traffic from citizens "who are usually up to no good and their intentions are probably not the best," and the vehicle would be exposed in the parking lot of a closed convenience store located on a state highway.

## C. Procedural Background

The district court began its analysis of *Sanders*'s second prong by concluding, as a prefatory matter, that the record lacked evidence Puentes's actions were motivated by a desire "to find evidence of a crime" or to "get" Ramos. It then concluded the five *Sanders* factors, on balance, demonstrated the impoundment was justified by a reasonable, non-pretextual community-caretaking rationale. As to the first factor, the district court concluded it weighed in favor of impoundment despite it being private property. In reaching this conclusion, the district court ruled that the private nature of the property did not significantly decrease the risk that Ramos's truck would be burgled or vandalized. Further, the district court weighed this factor in favor of impoundment because the property did not belong to Ramos. The district court also concluded the second *Sanders* consideration supported impoundment. Although Puentes did not consult the Hop & Sack's manager or clerk, the district court ruled that Puentes's knowledge of the sign posted in the store's window tipped this factor in the prosecution's favor. The district court also weighed the third *Sanders* factor in favor of impoundment. It did so on the following two bases: (1) the truck could not be legally driven by anyone because it did not have a license plate attached to its bumper; and (2) as the only patrol officer on duty that night in Frederick, it would not have been reasonable to obligate Puentes to wait to see if

13

someone would arrive to pick up the truck. Finally, as conceded by the government, the district court recognized that the fourth (implicated in a crime) and fifth (consent) factors weighed against impoundment. Nevertheless, on balance, the district court concluded the *Sanders* factors and lack of evidence of pretext supported the conclusion the impoundment of Ramos's truck was a reasonable community-caretaking action.

### III. ANALYSIS

This court reviews each of the *Sanders* factors individually before weighing them together, de novo, to determine whether the impoundment at issue was a reasonable exercise of community-caretaking. *See Venezia*, 995 F.3d at 1178. Before doing so, however, we explain why the presence or absence of a pretextual motive on the part of Puentes or Rodriguez is not outcome determinative in this case.

**A. Pretext**

The district court appears to have given particularly significant weight to its finding that the officers did not impound Ramos's truck as a pretext to "get" Ramos or as "an excuse to find evidence of a crime." At the "outset," the district court ruled "none of the *Sanders*'[s] factors point[] toward pretext on the part of the officers involved." In support of this conclusion, the district court summarized the officers' interactions with Ramos as captured on the officers' body cameras. Thereafter, the district court "turn[ed] to the individual factors, and weighing the factors, . . . conclude[d] that the impoundment was justified by a reasonable, non-pretextual community-caretaking rationale."

14

Ramos vigorously contests the district court's determination that the impoundment of his truck was not pretextual. He notes Puentes testified his protocol was to always impound an arrestee's vehicle if no one else is around. Thus, according to Ramos, without regard to whether Puentes was specifically trying to target him or find evidence of specific unrelated criminality in his truck, the impoundment was more broadly pursuant to an arbitrary pretext for criminal investigation. *See United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir. 1984) (holding that the community-caretaking doctrine "cannot be used to justify the automatic inventory of every car upon the arrest of its owner"); *see also Sanders*, 796 F.3d at 1249–50 (holding that the second prong of its required analysis—the presence of a reasonable, non-pretextual community-caretaking rationale—protects against impoundment practices like "impounding all vehicles whose owners receive traffic citations"); *cf. Arizona v. Gant*, 556 U.S. 332, 347 (2009) (holding that the Fourth Amendment does not permit officers to search every vehicle incident to arrest). Likewise, Ramos argues, the officers' decision not to explore the possibility of releasing the truck to Juanes was tainted by a protocol of only releasing vehicles to registered owners. The government does not defend the validity of this "protocol" on appeal. *See supra* n.6.

Ultimately, this court need not resolve whether the district court erred in either its (1) focus on whether the officers had a pretextual motive directed specifically at Ramos, or (2) finding that the officers did not have a pretextual motivation to target Ramos or find evidence he was committing additional crimes. Application of the *Sanders* factors compels the conclusion that the impoundment was unreasonable even

15

if undertaken without any type of pretextual motive. To be valid under *Sanders*'s

second prong, an impoundment must be both reasonable *and* non-pretextual. *Venezia*,

995 F.3d at 1182 ("It is unnecessary to decide whether the asserted community-

caretaking rationale was also 'pretextual.' In fact, in this case, the evidence of pretext

is scant. Yet, we held in *Sanders* that an asserted community-caretaking rationale

must be both 'reasonable' and 'non-pretextual.'"); *see also Chavez*, 985 F.3d at 1244

("The government must show that its [community-caretaking] interest outweighs the

individual's interest in being free from arbitrary governmental interference. This is

because a person's Fourth Amendment rights are not eviscerated simply because a

police officer may be acting in a non-investigatory capacity for it is surely anomalous

to say that the individual is fully protected by the Fourth Amendment only when the

individual is suspected of criminal behavior." (quotations, alterations, and citation

omitted)).[14]

---

[14] Our determination that this case can be fully resolved based on the reasonableness, or lack thereof, of the impoundment means there is no need to further elucidate or question the applicable standard of review. As noted above, this court has held that although the district court's underlying factual findings are reviewed for clear error, the *Sanders* factors are weighed de novo. *Woodard*, 5 F.4th at 1155; *Venezia*, 995 F.3d at 1178. Furthermore, it is clear the five *Sanders* factors bear on the existence of both pretext and reasonableness. *Compare Woodard*, 5 F.4th at 1155–58 (concluding all five factors point toward pretext), *and id.* at 1158–59 ("Not only does every factor point toward pretext, but other powerful evidence of pretext exists."), *with Venezia*, 995 F.3d at 1182 (holding that even absent evidence of pretext, the *Sanders* factors demonstrate the community-caretaking impoundment was unreasonable). *Sanders*'s focus on both reasonableness and pretext is unusual, but not without precedent. *Compare Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) ("Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable whatever the subjective intent motivating the relevant

**B. Public or Private Property**

The district court found that Ramos's "truck was lawfully parked on private property and not impeding traffic." Thus, one could safely assume the district court concluded it must weigh this factor against the reasonableness of the impoundment. *See Venezia*, 995 F.3d at 1178 ("The first *Sanders* factor weighs against impoundment because the vehicle was located on [private property]. Public safety and convenience are less likely to be at risk when the vehicle is located on private property as opposed to public property."); *see also Woodard*, 5 F.4th at 1155. Instead, the district court concluded this factor weighed in favor of impoundment because, (1) although the Hop & Sack parking lot was private property, it was not Ramos's private property; and (2) the private nature of the parking lot did not "eliminate all risk" to Ramos's truck. The district court erred in concluding this factor weighed in favor of the reasonableness of the impoundment. Instead, this court's binding precedent dictates the conclusion that this factor weighs against the reasonableness of the impoundment. *Venezia*, 995 F.3d at 1178. Indeed, the private nature of the property is a factor weighing against impoundment "that is entitled to more than a little weight." *Id.* (quotation omitted).

---

officials." (quotations, citations, and alteration omitted)), *with id.* (identifying exceptions to the general rule "where actual motivations do matter" (quotation omitted)). Because we resolve this appeal exclusively on the basis of objective reasonableness, it is entirely proper to consider each factor individually and to weigh them together de novo.

17

We begin with the district court's reliance on Ramos's non-ownership of the Hop & Sack parking lot in weighing this factor in favor of the reasonableness of the impoundment. Notably, the government does not mention this conclusion in its brief or attempt to defend the district court's reasoning. This court has weighed this factor against the reasonableness of a vehicle impoundment from private property, even when the private property did not belong to the vehicle owner. *See Venezia*, 995 F.3d at 1173, 1178 (motel parking lot); *Woodard*, 5 F.4th at 1151, 1155 (convenience store parking lot); *Sanders*, 796 F.3d at 1243, 1251 (Goodwill parking lot); *Pappas*, 735 F.2d at 1233, 1234 (tavern parking lot). To be clear, then, this factor asks whether the impoundment was undertaken from private property, not from the vehicle owner's property.[15]

In asking this court to weigh *Sanders*'s first factor in favor of impoundment, the government urges us to adopt the district court's view that the existence of a risk of vandalism bears on the public-versus-private-property question. The government's request in this regard runs into several hurdles. First, this court has concluded

---

[15] Because this court's precedent makes clear the question whether the vehicle owner is also the private property owner plays no part in *Sanders*'s first factor, it is unnecessary to address whether such an approach would impermissibly collapse the first and second *Sanders* factors. *See Venezia*, 995 F.3d at 1178–79 (holding as follows regarding *Sanders*'s second factor: "As mentioned [in discussing *Sanders*'s first factor], public safety and convenience are less likely to be at risk when a vehicle is located on private property. That risk is particularly diminished when the private property owner does not object to the vehicle's presence. For these reasons, we consider the property owner's consent, even if the property owner does not own the vehicle."); *id.* (refusing to consider matters relevant to *Sanders*'s third and fifth factors in considering whether *Sanders*'s second factor weighed against impoundment).

concerns relating to possible vandalism, and the municipal liability that could flow therefrom, are properly considered at the third *Sanders* factor. *Venezia*, 995 F.3d at 1179. Second, the only case cited by the government in support of its risk-based analysis of *Sanders*'s first factor, *Chavez*, 985 F.3d at 1244–45, does not bear the weight the government attempts to place on it. *Chavez* considered whether the seizure of an in-plain-sight firearm from a vehicle was a reasonable community-caretaking function.[16] *Id.* at 1243–44. It concluded firearm seizures were only "community-caretaking tasks" if necessary "to protect the public from the possibility that a [weapon] would fall into untrained or perhaps malicious hands." *Id.* at 1243 (quotation omitted). Necessarily noting the context-specific nature of this inquiry, and recognizing this court had approved some such in-plain-sight seizures from heavily trafficked, but private locales, *Chavez* nonetheless concluded the seizure at issue was unreasonable. *Id.* at 1243–45. In so holding, *Chavez* relied heavily on the remote nature of the private property and the availability of alternatives to seizure. *Id.* at 1244–45. This court sees nothing in *Chavez* to support the notion that a risk of vandalism is a viable consideration in *Sanders*'s first factor. Third, there is no merit to the government's assertion that just because this court has previously validated some community-caretaking impoundments from private property, the private nature of property must, sometimes, support such impoundments. Instead, a review of those

---

[16] Notably, there is not a single reference to *Sanders* in *Chavez*. This is most likely because of the vast contextual differences between vehicle impoundments and seizures of in-plain-sight firearms.

cases makes clear that impoundment was reasonable in each despite the fact the subject vehicles were parked on private property, not because the private nature of the property weighed in favor of impoundment.[17]

Ramos's truck was legally parked in a private parking lot and was not obstructing traffic. Thus, the first *Sanders* factor weighs against the reasonableness of the impoundment and must be accorded "more than a little weight." *Venezia*, 995 F.3d at 1178 (quotation omitted).

### C. Consulting Property Owner

*Sanders*'s second factor considers whether the owner of the private property upon which the vehicle is located was consulted about the potential impoundment. 796 F.3d at 1250; *see also Venezia*, 995 F.3d. at 1179 ("[P]ublic safety and convenience are less likely to be at risk when a vehicle is located on private property. That risk is particularly diminished when the private property owner does not object to the vehicle's presence. For these reasons, we consider the property owner's

---

[17] *See Trujillo*, 993 F.3d at 869–70 (validating impoundment from roadside private property when the vehicle position amounted to a traffic hazard, no licensed passenger was present, the driver lacked registration documents, and 2:30 a.m. "was not a good time of day to look for help from friends"); *see also id.* at 872 (holding that the two-prong *Sanders* inquiry does not apply to impoundments when there is "threat to public safety or traffic"); *United States v. Kornegay*, 885 F.2d 713, 715–16 (10th Cir. 1989) (validating impoundment from private parking lot when the officers did not know where the vehicle was registered because it had a Missouri license plate temporarily fastened over a Louisiana plate and officers could not identify the driver-arrestee because the driver's license he produced pictured someone else); *United States v. Johnson*, 734 F.2d 503, 504–05 (10th Cir. 1984) (validating impoundment when, in response to a call at 2:30 a.m., officers found a "highly intoxicated" man sitting in his car outside a lounge with a .357 caliber magnum revolver in plain view on the passenger seat).

consent . . . ."). Here, as set out specifically in the district court's order, "it is undisputed that the store owner, manager, and clerk were not consulted about towing or leaving [Ramos's] truck" in the parking lot. Nevertheless, the district court concluded this factor weighed in favor of impoundment because of the late hour, the Hop & Sack's midnight closing time, Puentes's "knowledge" of Hop & Sack's preferences as conveyed on the signage posted in the store's front window. The district court erred in concluding this factor weighed in favor of the reasonableness of the impoundment of Ramos's truck.

This court finds no real relevance to the late hour or the Hop & Sack's impending closure. These facts posed no impediment to Puentes's ability to consult with the clerk on duty that evening. Puentes obtained from the clerk a written statement regarding the events surrounding Ramos's assault on Hogan. Puentes did not consult with the clerk, or ask the clerk to consult with management or ownership, about Hop & Sack's preferences. According to Puentes, "it was not on his mind, he did not think to ask." Indeed, Puentes testified he believed consultation was unnecessary because impoundment was permitted by FPD policy. *But see Sanders*, 796 F.3d at 1250 (holding that compliance with standardized policy is necessary, but not sufficient, to render certain kinds of community-caretaking impoundments from private property reasonable for purposes of the Fourth Amendment). The record conclusively establishes consultation with the private property owner would not have been difficult, let alone impracticable. Accordingly, nothing about the circumstances

21

identified by the district court could make this factor weigh in favor of impoundment when no consultation occurred.

On appeal, the government leans heavily into the district court's conclusion that Puentes's knowledge of the Hop & Sack's preferences by reference to the store sign is sufficient to tilt this factor in its favor.[18] It is certainly true that "the community-caretaking interest may permit officers to impound a vehicle that interferes with a private property owner's use or enjoyment of their property." *Venezia*, 995 F.3d at 1179. As this court's precedent makes clear, however, this is a decision left up to the private property owner, not the police. This court's decision in *Woodard* holds that guesses about a property owner's preferences, even if they turn out to be correct,[19] are insufficient to carry this factor. Instead, this court "consider[s] whether the officers . . . consulted the property owner and learned of the property

_____

[18] To the extent the government's brief could be read as advancing the notion Rodriguez's knowledge of Hop & Sack's preferences is relevant, this court rejects that assertion. *See supra* at 11–12 (summarizing Rodriguez's testimony regarding his knowledge of Hop & Sack's preferences). Although the record makes clear Rodriguez consulted with Puentes about some aspects of the impoundment decision, there is no evidence indicating the officers consulted on this question. Furthermore, it is clear Puentes made the decision to impound Ramos's truck. Importantly, the district court found that "Puentes does not have any knowledge or understanding regarding the Hop & Sack's owner's or manager's preferences regarding vehicles being left overnight. His only knowledge is what is posted on the store sign." Consistent with all of this, there is no reference in the district court's analysis of this factor to Rodriguez's knowledge. Instead, the focus is exclusively on Puentes's knowledge obtained via the sign.

[19] Here, the record is entirely uncertain as to whether Puentes correctly predicted Hop & Sack's preferences. Based on various formulations of the relevant facts, both the Hop & Sack clerk and manager offered various after-the-fact answers as to the store's preferences.

22

owner's preference, not whether the officers . . . correctly inferred the property

owner's preference." *Woodard*, 5 F.4th at 1156; *see also Venezia*, 995 F.3d at 1179

(explaining officers' "fail[ure] to . . . consult . . . anyone who could speak for the

owner" belies contention they "impounded . . . based on the . . . owner's objection").

Because no such consultation occurred here, this factor weighs against the

reasonableness of the impoundment of Ramos's truck.[20]

### D. Alternatives to Impoundment

"Whe[n] an alternative to impoundment does not threaten public safety or

convenience, impoundment is less likely to be justified by a community-caretaking

rationale." *Venezia*, 995 F.3d at 1179. The district court concluded no reasonable

alternatives to impoundment existed because (1) Ramos's truck could not have been

legally driven on the roadway without the license plate attached, (2) Puentes was the

only officer on patrol that night in Frederick, and (3) Puentes had no obligation to

allow Ramos to make alternative arrangements. On the record before this court, and

---

[20] Of course, context is key. As noted above, the entirety of Puentes's understanding of Hop & Sack's preferences flowed from the posted sign. If that sign reasonably conveyed a desire on the part of the Hop & Sack to have law enforcement remove from its parking lot vehicles the officers considered to be trespassing, the result could very well be different. Here, however, the sign merely stated as follows: "Customer Parking Only Violators Towed." The government does not argue on appeal that this language could reasonably be read as an invitation to tow directed at the officers. Instead, it recognizes the sign's "purpose" was to "disclaim liability" under Oklahoma's trespass statute. Gov't Response Br. at 36. The government's concession is consistent with the only evidence in the record: the Hop & Sack manager testified the sign simply "meant the store was not responsible for a vehicle left in the parking lot, or if a vehicle was towed, the store would not pay the towing fee."

given our decisions in *Woodard* and *Venezia*, we must conclude the district court erred in concluding Puentes had no reasonable alternative to impounding Ramos's truck.

On appeal, Ramos identifies several approaches Puentes could have taken as alternatives to impoundment. It is enough to resolve this case to conclude that neither the district court nor the government has identified a valid impediment to acceding to Ramos's request to call Juanes to come and get the truck. *See Woodard*, 5 F.4th at 1156 ("[T]he police had an alternative to impoundment: letting [the defendant] call someone to get the car. He had asked, and the police refused.").

In reaching a contrary conclusion, the district court first focused on the absence of the license plate from the truck's bumper. Despite the government's vigorous embrace of this asserted impediment to allowing Juanes to retrieve the truck, the record reveals reliance on this fact is unreasonable. The truck was validly licensed, registered, and insured. The plate was present in the vehicle. Ramos used the truck as a tower and the tools necessary for this trade were present in the truck. Puentes testified he had no concerns about Juanes's ability to reattach the plate to the bumper and Juanes specifically testified she had the ability to do so. This case is, thus, entirely distinguishable from the facts in *Kendall*, 14 F.4th at 1123. The car in *Kendall* was stopped in the evening, had a faulty taillight, and was uninsured. *Id.* at 1120, 1124. "That means that no one could have legally operated [the car at issue in *Kendall*] that night." *Id.* at 1124. Here, on the other hand, the record leaves no doubt

24

that the condition rendering Ramos's truck "unlawful" to operate could have been remedied in a few short minutes with the simple use of a wrench or screwdriver.

Nor, on the facts of this case, can it reasonably be argued Puentes's status as the only FPD officer on patrol rendered this alternative to impoundment unavailable. There are no facts in the record demonstrating Puentes would be tied up dealing with the truck for a prohibitive length of time if he would have allowed Juanes to retrieve the truck. Instead, the scant record facts, specifically including the facts found by the district court, demonstrate just the opposite. Both Puentes and Rodriguez were well-familiar with Ramos and Juanes. Frederick is a small town and Ramos was well-known. Puentes had known both Ramos and Juanes since he was a child; Rodriguez had known Juanes his entire life.[21] Both officers knew Juanes lived in very close proximity to the Hop & Sack. Indeed, she lived several blocks closer to the Hop & Sack than the nearest tow truck operator. Ramos specifically told Puentes that Juanes was home when he asked that she be called to retrieve the truck. Juanes testified that she could have been at the Hop & Sack within three minutes if officers would have called her. In fact, although Puentes refused to honor Ramos's request to call Juanes

---

[21] These facts demonstrate why this court's decision in *Kornegay*, 885 F.2d at 715, is not meaningfully applicable to this case in several important ways. The officers in *Kornegay* did not know where the defendant's vehicle was registered because it had a Missouri license plate temporarily fastened over a Louisiana plate. *Id.* This left officers with no way to determine who owned the car and whether the owner would retrieve the car. *Id.* Furthermore, the officers in *Kornegay*, could not identify the defendant because the driver's license he produced pictured someone else. *Id.* Unlike in the case at hand, the facts in *Kornegay* left officers no option to either leave the vehicle in place or have an associate of the defendant take control of the car.

to take possession of the truck, Juanes learned on her own about the events at the store and arrived there approximately fifteen minutes *before* the tow truck arrived. Thus, there is nothing in the record to indicate it would have been more time consuming for Puentes to call Juanes as an alternative to impounding the truck. Nor can the government rely on any uncertainty that flows from the officers' flat unwillingness to explore an alternative.[22] The district court erred in doing just that in concluding this factor weighed in favor of the reasonableness of the impoundment.

Finally, this court's decision in *Woodard* compels the conclusion that the officers' asserted lack of "duty" to allow a defendant to arrange alternatives to impoundment is legally irrelevant to the third *Sanders* factor. *Woodard*, 5 F.4th at 1157 ("We express no opinion on whether the police have a duty to let someone else pick up a car when the driver is arrested. . . . It has nothing to do with the third pretext factor, which addresses the existence of alternatives to impoundment. Regardless of whether the police have a duty to let someone else pick up or move a car, the police either have alternatives or they don't."); *id.* ("Do the police have a duty to allow an arrestee to contact someone else to pick up or move the car from

---

[22] Because the record evidence indicates the reasonable alternative of contacting Juanes would not have left the truck exposed to a risk of vandalism for any time, let alone a meaningful time period, this court need not consider the matter further. *See Woodard*, 5 F.4th at 1158 ("The car was in a high-crime area? It wouldn't be for long if the police had let [the defendant] ask someone to pick up the car."). The same is true as to the government's after-the-fact briefing emphasis on the importance of Ramos's leaving the keys in the truck with the ignition running outside the Hop & Sack.

property? The parties haven't raised this question, and it has nothing to do with the third pretext factor."). *Id*.

None of the alleged impediments to contacting Juanes to come and pick up the truck, as Ramos specifically requested, identified by either the district court or the government on appeal reasonably render that alternative to impoundment unavailable. Because a reasonable alternative to impoundment existed, this factor weighs against the reasonableness of the impoundment.

### E. Implicated in a Crime

It is uncontested that Ramos's truck was not implicated in a crime and, therefore, "police had no need to preserve evidence by impounding the" vehicle. *Woodard*, 5 F.4th at 1158. That is, impounding the truck would not have provided evidence relating to the charges underlying his arrest—disturbing the peace, assault and battery on Hogan, or assault and battery on Puentes. Thus, the Fourth *Sanders* factor weighs against the reasonableness of the instant impoundment. *Id.*; *see also Venezia*, 995 F.3d at 1182.

### F. Consent of Vehicle's Owner/Driver

It is also uncontested that Ramos did not consent to the impoundment of his truck. Accordingly, the district court concluded below, and the government concedes on appeal, that this factor weighs against the reasonableness of the community-caretaking-based impoundment of Ramos's truck.

**G. Weighing All Factors Together**

To one degree or another, each of the five *Sanders* factors weigh against the reasonableness of the community-caretaking-based impoundment of Ramos's truck. That being the case, no weighing of the factors against each other is necessary. The impoundment was not reasonable and, thus, violated the Fourth Amendment.

## IV. CONCLUSION

The order of the United States District Court for the Western District of Oklahoma denying Ramos's suppression motion is hereby **REVERSED**. The matter is **REMANDED** to the district court for further proceedings consistent with this opinion. The government is hereby **ORDERED TO SHOW CAUSE** within three business days of the issuance of this opinion why the mandate should not issue forthwith.